In re John W. **HANES, Jr.,** Debtor.

Susan H. **CALDWELL,** Executrix of the Estate of Hope Y. Hanes, Robert W. Kleinschmidt and Turney McKnight, Trustees of the Revocable Trust of Hope Y. Hanes, Plaintiffs,

v.

John W. **HANES, Jr.,** Joseph Mitchell, Esq. and Reid & Preist, Defendants.

Bankruptcy No. 93–10238. Adversary No. 93–1292.

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

Sept. 17, 1997.

Jerry William Boykin, Michael Holm, Redmon, Boykin & Braswell, Alexandria, VA, for Plaintiffs.

Harvey B. Cohen, John C. Pasierb, Cohen, Gettings, Dunham & Davis, P.C., Arlington, VA, for debtor.

H. Bradley Evans, Jr., John E. Coffey, Michael Zupan, Hazel & Thomas, Alexandria, VA, for Joseph Mitchell and Reid & Priest, L.L.P.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Chief Judge.

This case arises out of a family investment plan set up by the debtor, John W. Hanes, Jr. and his brother, David Hanes, designed to invest the assets of their parents' estates in an effort to minimize substantial estate taxes. Plaintiffs in this action are Susan H. Caldwell, the debtor's sister, as Executrix of the Estate of Hope Y. Hanes (the "Estate") and Robert W. Kleinschmidt and Turney McKnight, Trustees of the Revocable Trust of Hope Y. Hanes (the "Revocable Trust"). The Estate filed a six count adversary complaint against John W. Hanes, Jr. ("Hanes" or "John"), Joseph C. Mitchell, Esq. ("Mitchell") and Reid & Priest, LLP. The Revocable Trust filed claims only against Mitchell and Reid & Priest.

The Estate's complaint seeks a judgment against defendant Hanes declaring its unsecured claim nondischargeable under section 523 of the United Stated Bankruptcy Code. The Estate contends that Hanes, in his capacity as executor, trustee and attorney–in–fact for his parents' estates, "looted" the family fortune by "treachery." The Estate claims that as a result of Hanes' alleged misconduct it has been damaged in the amount of $9,040,320.13. The Estate further claims that its alleged damages are nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6).

The Estate and the Revocable Trust[1] have also filed claims against Mitchell and the law firm of Reid & Priest for attorney malpractice, negligence, fraud and conspiracy to defraud arising from their actions in allegedly aiding and abetting Hanes in wrongfully taking the money and property of Hope Y. Hanes and the various Trusts. The Estate and the Revocable Trust claim that Mitchell and Reid & Priest are jointly and severally liable for the alleged damages suffered by the Estate.

The Court conducted a seven day trial on all of the plaintiffs' claims which concluded on December 10, 1996. On February 3, 1997, the parties submitted post–trial briefs, and the Court took the matter under advisement. After considering the evidence presented at trial, the arguments of counsel, the post–trial briefs and the entire record of the case, the Court makes the following findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## I. FINDINGS OF FACT.

### A. Background Facts.

On January 26, 1983, John W. Hanes, Sr. ("Hanes, Sr." or "Mr. Hanes") signed his Last Will and Testament naming his sons, John W. Hanes, Jr. and David Hanes, as co–executors of his estate. Hanes, Sr.'s will established a testamentary trust for the benefit of his wife, Hope Y. Hanes ("Hope" or "Mrs. Hanes") which was known as the John W. Hanes Marital Trust (the "Marital Trust"). Hanes, Sr.'s will appointed John and David as Trustees of the Marital Trust. In addition, on June 4, 1985, Mr. and Mrs. Hanes turned over control of their financial affairs through powers of attorney to their sons, John and David.

The evidence at trial suggested that John W. Hanes, Sr. suffered from Alzheimer's Disease during his final years, and on December 24, 1987, he died at the age of 95. Hanes, Sr. was survived by his widow, Hope, and five children: John W. Hanes, Jr., Agnes ("June") Hanes McKnight, Ormsby ("Cis") Matthiessen, Susan Hanes Caldwell and David Gordon Hanes.[2] Hanes, Sr. left an estate valued at approximately $14 million. Following his death, Hanes, Sr.'s assets were placed in the Marital Trust[3] for the benefit

---

1. By order dated May 22, 1996, this Court allowed the Revocable Trust to intervene in this proceeding and become a party plaintiff against Joseph Mitchell and Reid & Priest only, and not against the debtor.

2. Hanes, Jr. and his sisters Cis and June are the children of Hanes, Sr. and his first wife. David and Susan are the children of Hanes, Sr. and

Hope. Hanes, Sr.'s first wife died when Hanes, Jr. was ten years old, and he was raised by his stepmother, Hope.

3. The will was admitted to probate by the Surrogate's Court of Dutchess County on February 3, 1988. Presumably due to the ordinary course of probating Hanes, Sr.'s will, the Marital Trust was not actually funded until September, 1988.

of Mrs. Hanes for her life with the remainder to go to the remainderman, the five children of Hanes, Sr. At that time, the Marital Trust consisted of cash and securities worth $9,361,913.52.

Hanes, Sr.'s will gave his sons, John and David, broad discretionary powers as co-Executors and co–Trustees to administer and manage his estate. In addition, the powers of attorney executed by Mr. and Mrs. Hanes granted their sons broad plenary authority with respect to administration of their estates.

In late 1986 and early 1987, the Hanes brothers devised an investment plan for their parents' estates structured to minimize estate taxes. The family investment plan consisted of two parts. The first part was an annual gift program designed to utilize the maximum gift allowance to distribute money to the beneficiaries. The gift program used the trusts "Crummey" powers to transfer approximately $2.5 million without estate or gift tax to the beneficiaries.[4] The gift program benefitted both estates. If the $2.5 million actually distributed had been subject to the 65 % estate tax, the beneficiaries would have received only $875,000.

After the maximum gift tax exemption was utilized, the Hanes brothers devised the second part of the family investment plan which involved an estate planning technique known as the "corporate freeze." Under this plan, the Hanes brothers set up the Hanes Family Investment Limited Partnership ("HILP"). This was designed to provide a vehicle through which gifts from Mr. and Mrs. Hanes could be invested in order maximize

gain for their beneficiaries while at the same time avoiding tax liability.[5]

A short summary of the facts is as follows. HILP borrowed money from banks and invested the money in various businesses. The plan was to invest in businesses that could later be sold at a profit free from estate taxes. One of the businesses the family partnership invested in was DCI Publications, a chain of newspapers in Northern Virginia. In the late 1980's and early 1990's, the recession hit the newspaper industry hard, and DCI was no exception. In early 1990, Hanes began negotiations to sell the newspapers. In the summer of 1990, Gannett News offered to purchase the newspaper chain for $22.5 million. However, in December 1990, Gannett abandoned the deal. In early 1991, Hanes began negotiating with The Washington Times Corporation as a source of outside financing for DCI. In order to ensure that the deal with the Washington Times was successful, Hanes began dismantling the family investment plan, retiring debt and infusing his personal capital into the newspapers. The deal went through, and the Times stepped in and operated the newspapers for more than a year. However, in September 1992, the Times pulled out of the deal. On January 21, 1993, both DCI and John W. Hanes, Jr. filed bankruptcy.

## B. *The Parties.*

John W. Hanes, Jr. is the debtor in this Chapter 11 bankruptcy proceeding. Hanes is seventy one years old and a former long time resident of Alexandria, Virginia. He

---

**4.** In the landmark decision of *Crummey v. Commissioner*, 397 F.2d 82 (9th Cir.1968), the court upheld for the first time the application of the annual gift tax exclusion to gifts by a settlor to a grantor trust that had as its beneficiaries minor children with a limited right to withdraw the gift from the trust. *Crummey* holds that transfers by a grantor to a trust qualify for the annual gift tax exclusion, if the beneficiaries have a limited right to obtain all of part of the gift upon demand. Under *Crummey*, the limited demand right 'transforms' the gift in trust to the beneficiaries from a future interest to a present interest, thus qualifying it for the annual gift tax exclusion. Through the use of Crummey powers, the $10,000 per-donee gift tax annual exclusion can be used to avoid gift tax on the annual contribution for premium payments. Section 2303(b) of the In-

ternal Revenue Code allows an annual exclusion from gift taxes in the amount of $10,000 per year, per donee. I.R.C. § 2303(b).

**5.** The family limited partnership has been embraced by commentators as an effective estate planning vehicle which can be used to maximize estate, gift, and income tax savings to protect assets from creditors and other involuntary transfers, and to gift assets to one's children in a flexible manner. *See generally,* Terrance A. Kline, Planning Opportunities with Family Limited Partnerships, 68 FLA. B.J. 79 (1994); Robert G. Kurzman, A Family Partnership Still May Be the Best Entity to Meet Income, Estate Tax Goals, 17 EST. PLAN. 224 (1990).

currently resides in Montana with his wife. After graduating from Yale in 1950, Hanes worked for the office of the High Commissioner in Germany for approximately 2 years. He was then recruited to work for the CIA, which he did for one year in Munich. He returned to the United States and became Special Assistant to Secretary of State John Foster Dulles, serving first as the junior assistant and later as the senior assistant to the Secretary. He later became Assistant Secretary of State, holding that position throughout the Eisenhower Administration.

In 1961, Hanes joined the investment firm of Wertheim & Co. as an associate and became a partner in 1964. He stayed with Wertheim for ten years. He later served on the board of directors for numerous corporations, including the Olin Corporation Board for thirty years and the Squibb Corporation for twenty seven years. He also served on the board of directors and finance committees of numerous educational institutions. Additionally, he was Chairman of the U.S. delegation to the World Health Organization, Vice-Chairman of the U.S. delegation to UNESCO, U.S. delegate to a half dozen meetings of the U.N. High Commissioner for Refugees and the Intergovernmental Commission for European Migration. He was U.S. representative and co-Chairman of the Caribbean Commission. He also served on the International Commission on the Rules of Judicial Procedure.

During all times relevant to this action, Hanes held positions as co-Executor of his father's estate; co-Trustee of the Marital Trust, the Revocable Trust and the Masemer Trusts; attorney-in-fact for his father and his step-mother. Hanes was also appointed co-Executor of his step-mother's will. Hanes was also a general partner of the Hanes Investment Limited Partnership along with his brother, David.

In 1987, Hanes became involved with the DCI Companies. He was a nominal owner of 50% of four of the fifteen DCI Companies, including Dominion Partners of Virginia, Inc. Hanes was Chairman of the Board of Directors for all of the DCI Companies which operated the newspapers.

The Estate of Hope Y. Hanes consists of the assets of Hope Y. Hanes who died widowed on August 12, 1992 at the age of 86. At the time of her death Mrs. Hanes was a resident of Millbrook, New York. The evidence adduced indicates that Mrs. Hanes was an intelligent and educated woman. She was a very successful business woman, and actively participated in her own business affairs. She operated a profitable horse-breeding business, netting more than $4 million from 1988 through 1990. Although she was occasionally ill during her final years of life, the evidence at trial indicated that she was of sound mind, memory and understanding.

The Last Will and Testament of Hope Y. Hanes dated April 28, 1992 appoints John W. Hanes, Jr. and Susan Hanes Caldwell as co-Executors of her will.[6] The will also appoints Joseph Mitchell as an independent executor for the limited purpose of dividing her personal property.

Susan Caldwell is the current Executrix of the Estate of Hope Y. Hanes. Ms. Caldwell is a graduate of Sarah Lawrence College in Bronxville, New York. She did extensive graduate work at Columbia University and the University of Cincinnati, mostly in the areas of English, philosophy and art history. She ran her own art gallery in New York before dealing privately in the art business.

The Revocable Trust was created by Mrs. Hanes pursuant to New York law, by trust indenture dated May 21, 1991, with assets that had been distributed from the Marital Trust to Mrs. Hanes. Defendant Hanes and Mrs. Hanes were the original Trustees of the Revocable Trust. Robert W. Kleinschmidt[7] and H. Turney McKnight are the current Trustees of the Revocable Trust. Kleinsch-

---

6. Hanes resigned as executor of his stepmother's estate and as Trustee of the Revocable Trust on February 24, 1993.

7. Kleinschmidt had been serving as an investment advisor to the Masemer Trusts since 1987 and had been the investment manager for Mr. and Mrs. Hanes since late 1984. Shortly after Hanes, Sr.'s death, Kleinschmidt was hired as an investment advisor for the Marital Trust.

midt was appointed Trustee of the Revocable Trust on June 24, 1993. McKnight was appointed Trustee on March 26, 1994.

Defendant Reid & Priest LLP is a limited liability partnership engaged in the practice of law, with offices in New York City and elsewhere. Defendant Mitchell is an attorney at law who is licensed to practice in the state of New York. Mitchell was an associate at Reid & Priest from 1977 through 1980 and a partner at Reid & Priest from January 1, 1981 through June 1, 1992. From June 1, 1992 through August 30, 1992, Mitchell was of counsel at Reid & Priest. On August 30, 1992, Mitchell left Reid & Priest on good terms.

Mitchell began performing legal work of the Hanes family as early as 1985. In 1985, Mitchell worked on a matter with his partner, David Hanes, for John W. Hanes, Sr. involving the preparation of a charitable remainder trust called Blackacre Trust.[8] Following Hanes, Sr.'s death, Mitchell was the responsible attorney at Reid & Priest for handling the legal work for both John W. Hanes, Sr.'s estate and the Marital Trust to the extent David Hanes did not do the work himself. Following David's death in February 1991, Mitchell became a trustee of the Masemer Trusts. During the course of events at issue in this case, Mitchell and Reid & Priest represented the Estate of John W. Hanes, Sr., Hope Y. Hanes individually, the Trustees of the Marital Trust and the Trustees of the Revocable Trust.

### C. Related Non-Parties.

David Hanes was John's younger brother. David was a Phi Beta Kappa graduate of Yale and attended Columbia Law School. Upon graduating from Columbia, he clerked for the Chief Justice of the United States, the Honorable Warren Burger. After his term with Justice Burger, David entered the practice of law with the law firm of Wilmer, Cutler and Pickering. In 1974, he served as special assistant to the special counsel for the House Judiciary Committee for Impeachment Inquiry. He then became legal counsel for the Federal Energy Agency during the Ford Administration. After the Ford Administration, David founded the law firm of Colby, Miller and Hanes where he specialized in the field of taxation. His firm later merged with Reid & Priest. In 1987, David left Reid & Priest to devote his time to the family's estate planning.

During all times relevant to this action, David along with John, served as co-Executor of his father's estate, co-Trustee of the Marital Trust and the Masemer Trusts, attorney-in-fact for his father and his mother and general partner of the Hanes Investment Limited Partnership. The evidence adduced at trial indicates that David suffered from severe depression, and on February 24, 1991 he committed suicide. His widow is Ann Hanes Flinn.

### D. The Trusts.

In addition to the Marital Trust and the Revocable Trust, the Hanes family established two other trusts which are related to the present case: Lucy H. Masemer Trust I ("Masemer Trust I") and Lucy H. Masemer Trust II ("Masemer Trust II"). These trusts were created on October 23, 1986 and December 3, 1986 respectively, to facilitate gifts from Mr. and Mrs. Hanes to the family. The beneficiaries of the Masemer Trusts were the five children of Hanes, Sr., their spouses and issue. The beneficiaries' interests in the trusts reflected the distribution under Mr. and Mrs. Hanes' wills. The Masemer Trust I reflects the distribution of Hanes, Sr.'s estate after the death of Mrs. Hanes, and the Masemer Trust II reflects the distribution of Mrs. Hanes' estate. John and David were co-Trustees of the Masemer Trusts.

### E. The Hanes Family Investment Plan.

As stated above, the Hanes family investment plan was conceived by the Hanes brothers in late 1986 and early 1987 to enhance the family's wealth and compensate for extensive Estate taxes which were sure to ac-

---

**8.** The Blackacre Trust was prepared by David Hanes, who was a partner at Reid & Priest at the time. Mitchell testified that David requested that he be the billing partner because it involved a family matter.

crue upon the passing of Mr. and Mrs. Hanes. The plan was conceived because, although Hanes, Sr. had given tax planning advice to others, he had done little, if any, estate tax planning for himself, his wife or his children, exposing the estates to a potential tax liability of 65 % of their combined estates.

The vehicle used to achieve the plan's goal was a family limited partnership in which the Hanes children were the beneficial owners. The Hanes Investors Limited Partnership was formed on April 1, 1987 pursuant to a partnership agreement drafted by the law firm of Tucker, Flyer & Lewis. Originally, John and David were each General Partners of HILP, owning two and one-half percent (2½%) of the Partnership each. The remaining ninety-five percent (95 %) of HILP was owned by The Masemer Trusts I and II as limited partners. Each of these Trusts owned forty-seven and one-half percent (47½ %) of HILP.

Primarily, HILP borrowed money from banks and then made investments through loans, capital stock purchases or purchases of partnership interests. The bank loans were secured by the assets and personal guarantees of Mr. and Mrs. Hanes. The anticipated increase in value of the investments was to inure to the Hanes children outside of the elder Hanes' estates, thereby avoiding anticipated estate taxes. In addition to loans to HILP, the plan also included loans from banks directly to entities in which HILP had invested. These loans were also secured by the assets of Mr. and Mrs. Hanes.

HILP had four main investments: 1) The DCI Companies; 2) KSC Associates Ltd. Partnership; 3) Integrated Medical Systems; and 4) Video Rental of Western Pennsylvania. The DCI Companies were a group of Washington area newspapers, mainly weeklies, provided free to consumers and supported by advertising revenues. The DCI Companies published approximately 15 newspapers, including the Alexandria Port Packet–Gazette and the Connection newspapers.

The DCI Companies included DCI Publishing of Alexandria, Inc. and Dominion Partners of Virginia, Inc. HILP owned stock in some the DCI Companies. It also had a beneficial interest the DCI Companies that were Sub–Chapter S Corporations in the form of stock options.[9]

KSC Associates was a real estate development limited partnership which owned property and an office building in Alexandria, Virginia. Video Rental of Western Pennsylvania was a video rental company. Integrated Medical Systems was a start–up medical services company.

Between April 1, 1987 and November 2, 1987, pursuant to the family investment plan, Mr. and Mrs. Hanes pledged their custody accounts at Irving Trust Company (later the Bank of New York) as security for a line of credit for HILP. Prior to Hanes, Sr.'s death, HILP borrowed $1,485,000 from First American Bank and the Riggs Bank which HILP then loaned to the DCI Companies or invested in King Street Associates Limited Partnership and Integrated Medical Systems. Through the use of their powers of attorney, John and David collateralized theses loans with their parents' assets.

On June 2, 1987, John had a meeting with Hope regarding the family investment plan and the investment strategies being employed by David and him in their capacities as attorneys–in–fact. On that same date, Hope signed a letter to Joseph Dowding at the Irving Trust Company regarding her consent to the issuance of certain letters of credit to secure borrowings of the DCI Companies from First American Bank. In that letter, Hope reaffirmed that John and David had been granted powers of attorney to act on her behalf as well as on behalf of her husband, and that she and her husband had complete faith and trust in them. She also stated that, although John and David occupied positions of trust, she also expected them, as family members, to participate in the benefits of the family's bounty.

---

9. S–Corporations may have only individuals, estates, and certain types of trusts as shareholders. I.R.C. § 1361(b). They may only issue one class of stock. *Id.* HILP could only hold a beneficial interest in the form of stock options in Sub–S Corporations or the Corporations would lose their Sub–S status.

The family investment plan continued through 1987. On October 5, 1987, John sent a letter to David in which he personally guaranteed the investments of HILP in the DCI Companies. On December 24, 1987, Hanes, Sr. died. At this time, the family had posted collateral in the form of pledges and guarantees to secure various letters of credit and other borrowings in the total amount of $3,246,667. Of the total amount pledged as of Hanes, Sr.'s death, $1,860,000 was pledged as security for borrowing by or for the benefit of the DCI companies. In addition, the following pledges and guarantees had been made prior to Hanes, Sr.'s death:

1) On June 17, 1987, First American Bank loaned HILP $200,000 for the purchase of stock in IMS Corporation, the medical services company. This loan was secured by letters of credit in the total amount of $200,000 posted by Hanes, Sr. and Mrs. Hanes.

2) On June 5, 1987, Irving Trust loaned $866,667 to HILP for investment in KSC Associates, the real estate partnership. This loan was secured by a personal guarantee of Mrs. Hanes dated June 11, 1987 in the amount of $433,-333.50, and a guarantee of Hanes, Sr. dated June 11, 1987 in the amount of $433,333.50.

3) On August 3, 1987, Irving Trust Company loaned $160,000 to HILP for an investment in KSC Associates. This loan was also secured by guarantees of Hanes, Sr. and Mrs. Hanes in the amount of $80,000 each, also dated August 3, 1987.

4) On October 23, 1987, Irving Trust Company again loaned HILP $160,000 for investment in KSC Associates. This loan was secured by guarantees of Mr. and Mrs. Hanes in the amount of $80,-000 each, dated October 23, 1987.

Between February 9, 1988 and September 27, 1988, John and David as co-Executors of Hanes, Sr.'s estate, continued the family investment plan by pledging the Hanes, Sr.

Custody Account as collateral for borrowings by HILP from Irving Trust. Advances in the total amount of $2,326,700 were made by Irving Trust to HILP during that time. Assets from Mrs. Hanes' Custody Account were also pledged as collateral for these loans.[10] Some of the proceeds from these loans were used by the DCI Companies for operating the newspaper businesses.

On June 17, 1988, John and David sent the first of a series of memoranda to their sisters. The June 17th memo explained the set-up of HILP. It stated that the Masemer Trusts were the limited partners of HILP and that John and David were the general partners. It explained that HILP had made investments in certain companies including Dominion Newspapers and Dominion Partners. The memo stated that in order to make these investments, HILP had borrowed money from the Estate of John W. Hanes, Sr. and from Hope. It noted that HILP had paid fees to Hanes, Sr.'s estate and to Hope to utilize their credit. Finally, the memo stated that "HILP's total investments are around $5 million. Anything it makes, however, will have to be in the increase in value of the investments over this amount. These investments are "lockups" i.e., they cannot be made liquid on short notice. Most will have a time frame of around 5 years, if things go as planned."

On June 19, 1988, John and David met with their sisters in Old Lyme, Connecticut for a family meeting. Hope did not attend the meeting. At this meeting, John and David explained the family investment plan, the creation of HILP and John's involvement in the DCI Companies. They explained that borrowings by HILP had been guaranteed by the assets of their father's estate and Hope. The Hanes sisters concurred at that meeting to pledging assets of the Marital Trust to secure borrowings pursuant to the family investment plan.

In September 1988, the DCI Companies restructured their debt. Pursuant to the restructuring, Dutchess Bank, an affiliate of

10. The Pledge Agreements and Notes to Irving Trust during this time period were signed by John and/or David in their capacities as Executors of John W. Hanes, Sr.'s Estate, General Partners of HILP, Trustees of the Marital Trust or attorneys-in-fact for Hope. The Notes indicated that the loans were for "operating newspaper business."

Irving Trust Company, loaned $3,050,000 directly to the DCI Companies in order to consolidate the loans from other banks. The loans were evidenced by Promissory Notes bearing maturity dates of September 1, 1990 (hereinafter referred to as "the 1988 DCI Loans"). The funds from the 1988 DCI loans went to repay loans which had previously been backed by the assets of Mr. and Mrs. Hanes. Specifically, $1,485,000 of the 1988 DCI loan proceeds were used to repay the loans from First American Bank and Riggs Bank to DCI of Alexandria, Inc. and Dominion Partners of Virginia, Inc. which had been collateralized by letters of credit from Mr. and Mrs. Hanes. In addition, $1,565,000 was used to repay Irving Trust for loans to HILP on its line of credit which were secured by guaranties from Mr. and Mrs. Hanes and the assets of the Hanes, Sr. Custody Account and the Hope Y. Hanes Custody Account. The new 1988 DCI loan was secured by letters of credit of DCI of Alexandria and Dominion Partners, backed by the assets of the Marital Trust. Again, John and David executed the Pledge Agreements as general partners of HILP and under their powers of attorney on behalf of Hope.

Concurrent with the September 1988 refinance effort, Joe Mitchell and David Hanes met with a representative of Irving Trust to discuss, among other things, the mechanism for securing the 1988 DCI Loans. In that regard, an office meeting was held at Reid & Priest in New York on September 15, 1988 to discuss whether the Marital Trust assets could be pledged for the benefit of the DCI Companies. In attendance at this meeting were Mitchell, Nomi Zomick, a Reid & Priest associate, David Hanes, and Kathleen Hurt of Irving Trust. Mitchell indicated that in his view such pledges would be allowed under the will of Hanes, Sr., as the beneficiaries under the will were the beneficial owners of HILP, all of the beneficiaries under the will concurred with the pledges and the pledges were for the benefit of the family's investment in the DCI newspapers through the family partnership HILP. Mitchell discussed his analysis with John and David. The Bank requested an opinion letter, however, Mitchell declined to write an one because the Bank

was not his client. Instead, he prepared a letter to John and David, as Trustees of the Marital Trust, expressing his views. The Bank was satisfied with the letter, and the 1988 DCI loans went forward secured by the assets of the Marital Trust.

On October 3, 1988, John sent a memorandum to Hope, his sisters, and Robert Deans, the business advisor for Susan and Cis, regarding the agenda for the upcoming family meeting scheduled for October 22. On that same date, David also sent a seven page memorandum to John and his sisters with a copy to Mitchell in preparation for the October 22 family meeting. David's memo detailed the actions he and John had taken with regard to their parents' estates, including their actions under the powers of attorney, their actions as Executors and Trustees, the purpose of HILP, the purpose of the Masemer Trusts and the tax issues affecting the Estate of John W. Hanes, Sr.

On October 22, 1988, the Hanes family held a meeting concerning the status of the family finances. The meeting was attended by John and David, their sisters, Cis and Susan, Robert Deans and Joe Mitchell. At the meeting, John and David discussed the status of the DCI Companies and the family's investments therein through HILP. This discussion included the action taken in connection with the pledging of collateral by the Marital Trust and the Hope Y. Hanes Custody Account to secure loans from Irving Trust to HILP to accomplish these investments on the family's behalf. June McKnight did not attend the October 22 meeting, but met with her brothers and her son Turney in Alexandria shortly thereafter. At that meeting, John told his sister that everything was going well and that they expected realization on their investments within five years. At neither of these meetings did John or David tell their sisters that DCI was operating at a loss.

Throughout 1988, the DCI Companies continued on their program of expansion through the acquisition and formation of newspapers. This created the need for additional funds for these purposes as well as the operation of the newspapers. Funds were

provided, in part, by HILP, which continued to borrow money secured by pledges of collateral from the Marital Trust and the Hope Y. Hanes Custody Account. In early 1989, Irving Trust Company and the Dutchess Bank merged into the Bank of New York ("BONY"). After taking over the account, Kathleen Hurt and Joseph Dowding of BONY met with Hope and John. At that meeting, Hope indicated to Hurt and Dowding that she understood that the assets from the Marital Trust and the assets from her own Custody Account had been pledged to BONY as collateral for the family's credit facilities.

During 1989, David sent several memoranda to his siblings. On February 2, 1989, he sent a memorandum to his sisters with copies to John, Robert Deans and Mitchell regarding cash disbursements from the Masemer Trust I. On May 17, 1989, David sent another memorandum to his sisters describing the plans for the newspapers and explaining that the papers would continue to have losses during 1989. On October 3, 1989, David wrote to his siblings concerning the status of the investments in the DCI Companies. David's letter stated that there was substantial debt that had to be repaid before the DCI Companies could show a profit. At that time, David stated that the DCI Companies were expected to break–even in 1990 and projected there would be "an application of profits to repayment of debt" sometime in 1991.

Later in October 1989, John and David both personally and on behalf of HILP wrote Peter Labovitz, the co–owner of the DCI Companies, regarding a mechanism to fund DCI operations. That letter noted that the DCI Companies had a considerable need for additional financing because both John Hanes and Peter Labovitz had essentially exhausted their personal funds. A copy of this letter was sent to Mitchell.

Also in October 1989, John and David formed the Westerleigh Associates Limited Partnership for the purpose of borrowing

additional funds for use by the DCI Companies to meet their short–term cashflow needs. Westerleigh Associates borrowed $1 million from Sovran Bank. The loan from Sovran was secured by two $500,000 certificates of deposit, one funded by the Marital Trust and one funded by the Hope Y. Hanes Custody Account at BONY. This short–term Westerleigh loan was repaid at the end of January 1990, when the DCI Companies received $4.2 million in long–term financing from Sovran Bank. This $4.2 million loan, which was increased to $5.2 million in July 1990, was secured in part by the two $500,000 CDs which had secured the earlier loan to Westerleigh. All of the stock in the DCI Companies was also pledged as security for this loan.

In February, 1990, Hope signed the documents pledging both $500,000 CDs as security for the Sovran loan.[11] She also signed two letters dated February 9, 1990 to Sovran Bank expressing her understanding of the loan and her desire to pledge the $500,000 CDs as collateral. In one of the letters, Hope stated: "I am the mother of one of the individual Borrowers, and by virtue of that relationship I am interested in the welfare of such Borrower and the corporate Borrowers of which he is a shareholder, and I therefore have received good and adequate consideration for my undertakings under the Pledge Agreement." At David's request, the Hanes sisters also signed a consent to the pledge of the CDs.

On or about February 20, 1990, John and David sent a memorandum to their sisters which outlined the status of the family investment plan and identified the use of Marital Trust assets as collateral to secure funds which would ultimately be loaned to the newspapers. The memo explained that they had obtained a $2 million bridge loan from Sovran Bank. Along with the memo, they forwarded consideration letters to their sisters for their signatures at the request of Sovran Bank. The Hanes sisters signed the consideration letters. The February 20th

---

11. Also in January 1990, Hope sent several letters and supporting documentation to Irving Trust to make gifts to the Masemer Trusts totaling $320,000. This was part of the annual gift-ing program in which Hope utilized her maximum gift tax exemption by gifting $10,000 to each of her heirs.

memo also reiterated Hope's concurrence in John and David's activities.

In early 1990, the legal department at BONY began a review of BONY's loan documentation for the Hanes family credit facilities. BONY reexamined the pledge of the Marital Trust assets which secured both the 1988 DCI loans and HILP's line of credit. Mitchell and David believed that the issue had been adequately addressed approximately eighteen months earlier by Mitchell's September 16, 1988 opinion letter. Nonetheless, BONY's legal department wanted to revisit the issue and remove any and every conceivable challenge to their collateral.[12] Notwithstanding these concerns, BONY's loan officers recommended approval of an increase of $1.5 million to the HILP line of credit. This recommendation was approved on May 14, 1990 and BONY made the loan, secured by a pledge of assets from the Marital Trust and the Hope Y. Hanes Custody Account.

On August 10, 1990, Mitchell attended a meeting at BONY with Joe Dowding, Kathleen Hurt and the bank's attorney, Lou Di-Cerbo, regarding the availability of Marital Trust assets as security for loans to third parties. Following this meeting, Mitchell and David in conjunction with BONY officials discussed a plan to terminate the Marital Trust and create a Revocable Trust containing a specific power permitting its Trustees to hypothecate Trust assets to secure loans made to entities in which any beneficiary of the Trust had an interest. These pledges would be permitted with or without consideration to the Trust. The terms of this arrangement were distilled into a term sheet by Mitchell and faxed to BONY on September 21, 1990. Pursuant to the term sheet, the termination of the Marital Trust was to be approved by Mrs. Hanes, the presumptive remaindermen and the contingent adult remaindermen.

In the meantime, in the Summer of 1990, the DCI Companies were engaged in negotiations with Gannett newspapers and others for the sale and purchase of the DCI Companies. On September 21, 1990, Gannett issued a letter of intent to purchase the DCI Companies for $22.5 million. Gannett conducted an investigation of DCI and continued to negotiate the purchase. By December 1990, the negotiations with Gannett had ceased, and the deal was never consummated.

It is undisputed that no new funds were borrowed against the assets of Mrs. Hanes or the Marital Trust after July of 1990. By the end of 1990, the DCI Companies were faced with approximately $4.5 million in current obligations. HILP owed a total of almost $4.2 million in demand debt to BONY, which was secured by assets of the Marital Trust and the Hope Y. Hanes Custody Account. In addition to these obligations, the assets of the Marital Trust and the Custody Account secured the 1988 DCI Loans ($3,050,000) which, after several extensions, were due to mature on April 2, 1991. Also, the CDs of the Marital Trust and the Custody Account secured Sovran lending to the extent of $1,000,000. The total amount of the family assets pledged was approximately $8,250,000.

From January 1991 forward, Hanes contributed approximately $10 million in personal assets to the DCI Companies in the form of cash, guarantees and asset pledges. Prior to this time, Hanes only had $250,000 invested in the DCI Companies with no personal exposure or exposure of his assets. Hanes eventually lost all his $10 million contribution.

**F. The 1991 Washington Times Financing.**

By the end of 1990, the Hanes brothers were left in a precarious position. The Gannett deal had fallen through, the recession had hit and DCI's revenues were rapidly decreasing. The Companies were badly in need of cash. In an effort to preserve the family's investment, Hanes began negotia-

12. Mitchell testified that in the months that followed, there were sporadic discussions about BONY's concerns between himself, John, David and representatives of BONY. He stated that during 1989 and 1990, BONY would raise the issue of the power to hypothecate the assets of the Marital Trust off and on, dropping it for several months. Mitchell understood BONY's reason for revisiting the issue on this occasion to be that the Bank had been taken over and had changed lawyers.

tions with The Washington Times Corporation (the "Times") in early 1991 as a source of outside financing for DCI. This arrangement was to infuse substantial additional capital into the DCI Companies. Although the deal was not solidified until sometime in October 1991, the Times had stepped in and began operating the newspapers in the spring of 1991.

During this same time, Hanes was involved in refinancing the prior $5.2 million dollar loan from Sovran Bank to DCI. The refinancing of the Sovran Bank debt included a roll-over of the two $500,000 CDs previously pledged by Hope and the Marital Trust. With regard to this transaction, Hope signed a First Amendment of Collateral Assignment which reiterated Sovran's security in her $500,000 CDs. By signing the Collateral Assignment, Hope represented and warranted that she had received a copy of the new loan agreement and that she understood that it was a condition precedent to the Loan that the CD be pledged to the Bank as security for all of the obligations. In conjunction with the Times financing and the Sovran Bank refinancing, the Hanes family entered into the "Hanes Lender Intercreditor Agreement" establishing the priority of DCI obligations to Hope Hanes and the Revocable Trust which were subordinated to their obligations to the Times and to Sovran Bank.

### G. *Refinancing of the BONY Debt.*

In the Spring of 1991, BONY again raised its concerns about the validity of the pledges of Marital Trust assets which, together with the Hope Y. Hanes Custody Account, secured the $4.2 million existing BONY debt. BONY demanded new documentation, before these loans could be extended. Specifically, BONY required that the Marital Trust be terminated and a new trust created containing specific language satisfactory to the Bank regarding the Trustees' authority to pledge trust assets. BONY indicated to the Hanes brothers and Mitchell that these loans would not be extended without the creation of the new trust.

On March 25, 1991, Mitchell wrote a memorandum to John setting forth the nature of BONY's concerns. In that memorandum, he again articulated the view that he had expressed in September of 1988 when the Marital Trust assets were first pledged, i.e., that there was a theoretical argument that the Trustees of the Marital Trust lacked the authority to hypothecate the trust assets for the family's investments, but that the most likely outcome in the event of any objection to the pledges would still be to permit the Bank to enforce its lien on the trust assets. In order to allay the concerns of BONY, Mitchell recommended the Marital Trust be terminated and a new trust be created which would specifically contain the authority to hypothecate assets.

On May 21, 1991, Mitchell, John and Hope met to discuss the termination of the Marital Trust and the creation of the Revocable Trust. John explained to Hope the reasons for terminating the Marital Trust and creating the Revocable Trust. In addition, Mitchell explained to Hope that BONY wanted the new trust so that the authority to pledge the Trust assets was clearly spelled out in the trust instrument, thereby avoiding any possible challenge to the pledges in the future. Mitchell also explained that, in his opinion, BONY had a valid and enforceable security interest in the assets pledged from the Marital Trust; therefore, the request by BONY did not change the family's financial picture. John and Hope agreed that the Marital Trust would be terminated and a new trust created containing the language that BONY demanded. At the conclusion of the meeting, Hope signed the documents authorizing the termination of the Marital Trust and the creation of the Revocable Trust. The documents included a letter from Hope to BONY stating, *inter alia.* "This is to confirm that I consent to and approve of the execution and delivery of the Pledge Agreement by the Trustees of the Trust to the Bank of New York and hereby ratify the same in all respects." The Revocable Trust had the same dispositive terms as the Marital Trust. However, the Revocable Trust contained additional language, required by BONY, relating to the authority of the trustees to pledge the trust assets. In all other material aspects, the

Revocable Trust was identical to the Marital Trust.[13]

On June 12, 1991, the Marital Trust was terminated. On that same date, Mitchell sent a memorandum to the residuary beneficiaries of the Marital Trust. In that memorandum, Mitchell explained the purpose for the termination of the Marital Trust and the creation of the Revocable Trust. Mitchell's memorandum stated:

> Your cooperation is required in connection with the continuing credit arrangements which support the family's investments through [HILP]. As you know, the assets of Hope Hanes and the Marital Trust under the Will of John W. Hanes for Mrs. Hanes' benefit (the "Marital Trust") have been pledged to the Bank of New York ("BONY") for the repayment of loans to HILP. At this time, HILP owes to BONY $4,197,333. The loan proceeds have been used by HILP to make investments in the newspaper companies and other ventures. In one of its periodic reviews, BONY's counsel has raised concerns relating to the Marital Trust's ability to pledge its assets for a loan to a separate entity (HILP) even though the beneficial owners of the separate entity are also the beneficiaries of the Marital Trust. In BONY's view, Mr. Hanes' Will does not clearly contemplate the pledge of the Martial Trust assets for the HILP loan; apparently, the bank is concerned that this technical legal argument will be used by the Marital Trust to defeat or delay the exercise of the bank's right to reach the Marital Trust assets in the event that HILP does not repay the loans.
>
> To allay BONY's concern, the Marital Trust has been terminated and a new trust has been created. Since the exercise of the power of termination by John Hanes, as sole surviving trustee, would create a tax problem for him, Mary Lamb and I

were appointed as additional trustees. Mary and I then terminated the Marital Trust and the entire corpus of the Marital Trust was transferred to Mrs. Hanes who, immediately, retransferred the assets to the new trust which was created under an agreement dated May 21, 1991 ("the New Trust").

Mitchell's memorandum goes on to explain that the new trust included language authorizing John and Hope to pledge trust assets for loans made to beneficiaries or entities in which the beneficiaries have an interest. Finally, the memorandum requests that the remaindermen execute Consents. The first Consent approved the pledge of the new Trust's assets to secure the HILP loans. The second Consent approved the termination of the Marital Trust and released Mitchell and Mary Lamb for their actions in terminating the Trust. Also on June 12, 1991, Mitchell sent a request, at the insistence of BONY, that each of the presumptive remaindermen of the Revocable Trust and all of their children sign consents agreeing to the refinancing. Each of the presumptive remaindermen and each of their children signed the documents consenting to the refinancing of HILP's loans with BONY, consenting to the pledge of assets from the Revocable Trust as collateral for the consolidated loans, and releasing Mitchell and Mary Lamb. Prior to execution of the Consents and Releases, Susan Caldwell consulted an attorney, William Kramer of the firm of Mudge, Rose, Guthrie, Alexander & Ferdon, in connection with her execution of the foregoing documents. After being advised by her counsel of her individual rights with respect to this matter, Ms. Caldwell signed the Consent to the loan and the Release.

Hope also signed the Consent to the refinancing, the pledge of the assets of the Revocable Trust and the release of Joe Mitchell and Mary Lamb for their services as Trust-

---

**13.** Beginning in May 1991, Hope was also arranging a family trip to France. Barbara Kushner, one of the family's bookkeepers, sent Hope several memos updating her on family business. These memos concerned the details of Hope's affairs. Several memos itemized the expenses for the trip to France totaling more than $20,000, and updated Hope as to what had been paid to date. The memos also relate to other bookkeeping matters including, a $250 loan to a staff member, subletting an apartment in Washington, D.C., reimbursement for medical expenses, payment of dues for various organizations, payment of college tuition for Hope's grandchildren and signing the new signature cards for the new trust checking account.

ees of the Marital Trust.[14] On June 6, 1991, Hope sent two letters to Sovran Bank advising Sovran that its Certificate of Deposit was transferred from the Marital Trust to the Revocable Trust, and affirming that the Certificate of Deposit would remain subject to Sovran's security interest.

On June 19, 1991, BONY proceeded with the contemplated refinancing, rolling all previous HILP debt into one note in the amount of $4,197,333. The previous debt had been secured by the Marital Trust and the Hope Y. Hanes Custody Account, as well as by personal guaranties of Mr. and Mrs. Hanes. The new note was secured by a pledge of assets in the Custody Account and the assets of the new Revocable Trust. No new funds were advanced in this transaction.

## H. *Dismantling the Family Investment Plan.*

The existence of the 1988 DCI loans was an impediment to the negotiations with the Times. John and David decided that it was in the best interests of the family's investment plan for Hope to purchase those loans from BONY, which were supported by her assets and the Marital Trust.[15] Mitchell advised both John and David that unless the DCI loans were purchased for fair market value, which was arguably less than their face amounts, the difference between the purchase price and fair market value would be considered a gift for tax purposes. He advised them that to avoid significant gift tax exposure, Hope and the Trustees of the Marital Trust should enter into a wider transac-

tion in which they purchase other assets from HILP at prices which would result in Hope and the Marital Trust receiving, in total, property having a fair market value for tax purposes equivalent to the cash which they paid.

Beginning in March 1991, Hanes began dismantling the family investment plan. The terms of the agreement to effectuate this transaction were set out in two letters from Hanes to Mitchell dated March 15, 1991 and March 18, 1991.[16] The terms were as follows. Hope and the Marital Trust would purchase certain assets owned by HILP. Hanes on behalf of HILP, would transfer to Hope 80% of HILP's equity interest in the DCI Companies and use his best efforts to cause the transfer to her of 10% of the interest held by the John W. Hanes, III Trust in the DCI Companies. In addition, in order to further reduce the bank debt of HILP, HILP would transfer to Hope and the Marital Trust its interests in its other investments (IMS, KSC Associates and Video Rental of Western Pennsylvania) together with approximately $1.4 million in notes receivable of the DCI Companies held by HILP, which were supported by Hope's assets and the Marital Trust. In return, Hope would provide approximately $1.9 million toward the repayment of HILP's obligations. The March 18, 1991 letter was signed by John W. Hanes, Jr. as: 1) attorney–in–fact for Hope Y. Hanes; 2) Trustee of the Marital Trust; and 3) General Partner of HILP.

On March 19, 1991, Mitchell sent a letter to BONY enclosing instruction letters from

---

14. Mitchell and Mary Lamb were appointed as Trustees of the Marital Trust for the sole purpose of terminating the Trust in order to avoid the exercise of the power to terminate by Hanes being possibly treated as a gift to Hope by the Internal Revenue Service.

15. In connection with this decision, David asked John to update his October 5, 1987 agreement to stand behind the investments in the newspapers to reflect the changes in form that the investments had taken and were about to take. On that same date, John sent a letter to David reaffirming his guarantee of the family's investment in the DCI Companies. In that letter, John stated that he would protect HILP, the Marital Trust and Hope personally against any loss on such investments, either by repurchasing such investments (including loans or pledges of collateral to

secure such loans) at cost, or otherwise as appropriate.

16. Mitchell testified that he assisted Hanes in the drafting of the March 15, 1991 letter agreement. Further evidence suggested the letter was modified after March 1991, but kept the original date. Mitchell testified that the documents contain the March 1991 date because that is when the transactions occurred. The Estate concedes that this letter was never sent to Hope or the Hanes sisters. In fact, there was no evidence that either Mitchell or Hanes submitted this letter to any other party or used it for any purpose other than to outline the transactions for themselves. Accordingly, although we do not condone backdating of documents, we find this letter to be of no consequence in this action as there was certainly no reliance upon it by any party.

Hanes requesting the transfer of $2,069,785 from the Marital Trust custody account to its checking account and $994,702.50 from Hope's personal Custody Account to her checking account to facilitate the purchase of the DCI notes from BONY. The loans were purchased at face value because they were fully collateralized by the prior pledges of both the Hope Y. Hanes Custody Account and the assets of the Marital Trust.

On or about August 7, 1991, John sent a seven page memo to Hope and his sisters outlining the status of the Hanes family investments. John stated that "[w]e did have rather bad luck," explaining that the negotiations to sell the newspapers had broken down at the last minute. The memo to the family indicated that the recession had hit the newspaper industry hard and that DCI was left in a difficult financial position. John told them that revenues were down by over a third and the value of the papers had dropped by at least 60%. John stated that he and Peter Labovitz were committed to doing everything they could to restore the value to the investment. John emphasized, "but I do mean 'restore' it isn't there now, and it will take a lot of work, probably for at least five years, to bring it back." He also summarized the family's other "risk" investments some of which were also troubled and some that were doing well. He went on to alert them that the picture was mixed, and that he was concerned about the troubled situations. John assured the family that he would continue to use every effort to avoid any additional losses. John's memo estimated that the family's exposure on an after–tax basis was $1.5 million on the DCI investment and $750,000 on the KSC investment.

On or about August 26, 1991, Hope became a general partner in HILP with a 2.5% beneficial interest. This was done to strengthen the position that the stock pledges by Hope were for business purposes and therefore deductible by the estate if lost to foreclosure. Hope signed the documents acquiring this interest. Thereafter, Hanes continued to dismantle the family investment plan by purchasing assets to retire debt for which securities were already pledged and to avoid a "tax train wreck." In November 1991,

Hanes transferred $1,635,000 to HILP from the Revocable Trust Custody Account. On or about December 23, 1991, he also transferred $275,000 to HILP from Hope's custody account. These funds ($1,635,000 and $270,000) were used to reduce the debt owed by HILP to BONY from $4,197,333 to $2,708,534.43, which was secured by Hope's Custody Account and the Revocable Trust Custody Account. HILP used the remaining funds to pay the consideration fee of $47,-127.11 to both the Revocable Trust and Hope for HILP's prior use of the assets as collateral. HILP also used $300,000 to reimburse Hope, the Revocable Trust and John for advances made by them to HILP to cover interest payments made in 1991.

In addition, on December 16, 1991, Hope acquired HILP's interest in Video Rental of Western Pennsylvania for $100,000. On December 20, Hope acquired HILP's interest in KSC Associates for $420,000. On that same date, Hope and the Revocable Trust acquired a part of HILP's interest in Integrated Medical Systems, Inc. by acquiring 83,334 shares at $6.00 per share for a total purchase price of $500,004. In addition, Hope received 80% of HILP's interest in DCI and 10% of the equity interest held by the John W. Hanes, III Trust. However, Hope's interest was subject to the waiver agreements that were in place whereby HILP had agreed that it would not exercise any options to purchase DCI stock without the approval of Sovran Bank.

On February 21, 1992, John sent a letter to his sisters requesting that they schedule another family meeting. On April 1, 1992, the Hanes family convened a family meeting in Mitchell's office at Reid & Priest. Present were Susan, June, Cis, Ann Hanes Flinn, Kleinschmidt, John and Mitchell. At the meeting, John discussed with his family the status of the investments in the DCI Companies, the fact that at this point in time they had little or no value and the potential diminution in the value of Hope's estate and the Revocable Trust assets. John projected that it would take three to four years for DCI to become profitable to enable them to repay debt.

Shortly thereafter, on April 10, 1992, Susan sent a letter to Hope regarding her understanding of some of the information from the April 1st meeting. Susan testified that prior to this letter she had never discussed with her mother either HILP, the Masemer Trusts, the Marital Trust, the Revocable Trust or the family's investment plan.[17] The following day, Susan and Sam Shaw, Hope's close friend, met with Hope in Millbrook, New York to discuss these matters. Susan and Mr. Shaw drafted a letter for Hope's signature to John requesting a meeting to explain the financial condition of her affairs. The letter was signed "with love for you, Hopie."

On April 17, 1992, John and Mitchell went to meet with Hope in her home in Millbrook. Sam Shaw was also present. At the meeting, John reviewed with Hope the status of the investments in HILP, the financial condition of the DCI Companies, and the impact of these investments on Hope's personal estate, as well as the Revocable Trust. In the months that followed, John continued to visit Hope frequently as did Susan. In May 1992, Hope executed a new will continuing John as co–Executor and naming Susan as co–Executor. She also executed a power of attorney to Mitchell to sell her apartment in New York. On August 12, 1992, Hope died. Mrs. Cunningham, Hope's nurse and John were present at her bedside.

## I. *The Fall of DCI.*

In September 1992, the Washington Times pulled out of the deal to provide financing for certain of the DCI Companies' debt. DCI then defaulted on its loan obligation to Sovran Bank, and Sovran seized the $1 million in CDs. Tony Webb testified that prior to the Times pulling out from their allegiance with DCI, DCI had begun a turnaround, showing positive cashflows for several consecutive months.

On January 21, 1993, the DCI Companies and John Hanes, Jr. filed for bankruptcy. During the course of the DCI bankruptcy, DCI brought claims for breach of contract against the Washington Times. Those claims were settled in this Court with the Washington Times making cash payments of $500,000 to DCI and approximately $4 million to NationsBank, which released a secured claim for approximately $5 million. In addition, the Washington Times abandoned its claims against DCI totaling more than $16 million.

## II. *JURISDICTION.*

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and the General Order of the United States District Court for the Eastern District of Virginia. The claims against the debtor constitute a core proceeding under 28 U.S.C. § 157(b)(2)(1) & (J). The claims against Joseph Mitchell and Reid & Priest are non-core related claims under 28 U.S.C. § 157(c)(1). The parties have consented to this Court's entry of a final order and judgment on these claims.[18] *See* 28 U.S.C. § 157(c)(2). Therefore, this ruling constitutes a final order determining all issues presented, subject, of course, to the right of any party to appeal to the U.S. District Court under 28 U.S.C. § 158(a).

## III. *CONCLUSIONS OF LAW.*

### A. *Dischargeability of Debt under § 523.*

The Estate grounds its nondischargeability complaint upon §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6) of the Bankruptcy Code. The Estate's position is that Hanes engaged in a continuous pattern of self–dealing and conflict of interest amounting to fraud, breach of fiduciary duty and conversion. The Estate contends that Hanes committed fraud by concealing material facts and providing Hope

---

**17.** Similarly, June testified that she had never discussed the family's business or the family investment plan with Hope.

**18.** Pursuant to Federal Rule of Bankruptcy Procedure 7008(a), the plaintiffs declared in their adversary complaint that the claims against

Mitchell and Reid & Priest are non-core related claims, and expressly consented to entry of final orders and judgments by this Court on those claims. *See* Third Am.Compl. at ¶ 13. Mitchell and Reid & Priest have at least impliedly consented to this Court entering a final order on this matter under 28 U.S.C. § 157(c).

and the beneficiaries of the Marital Trust with misleading or selective information. The Estate's theory of breach of fiduciary duties is based upon Hanes' alleged mismanagement of the Hanes family assets to prefer his self-interest to that of his stepmother and his sisters. The Estate maintains that Hanes' self-dealing was compounded by the unauthorized and imprudent use of the Hanes family assets for speculative investments. For these reasons, the Estate asserts that Hanes must be surcharged for all losses sustained by the Estate and requests a nondischargeable judgment against Hanes in the amount of $9,040,320.13.

### B. General Standards for Objections to Discharge.

Generally, bankruptcy operates as a discharge of all provable debts, giving an "honest but unfortunate debtor" a fresh start. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755, 765 (1991). The exceptions to discharge are narrowly construed in favor of the debtor in furtherance of the Bankruptcy Code's "fresh start" policy. *See Spencer v. Hatton (In re Hatton )*, 204 B.R. 470 (Bankr.E.D.Va.1996), *aff'd*, 204 B.R. 477 (E.D.Va.1997); *Morrissey v. Wiencek (In re Wiencek)*, 58 B.R. 485 (Bankr.E.D.Va.1986). The Estate has the burden to prove the elements of its claims under § 523 by a preponderance of the evidence. Fed.R.Bankr.P. 4005; *see Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 n. 17 (4 th Cir.1994) (citing *Grogan v. Garner*, 498 U.S. at 286–87, 111 S.Ct. at 659 (1991) (establishing preponderance of the evidence standard regarding dischargeability determinations under 11 U.S.C. § 523)).[19]

### C. Standing to Bring an Action to Determine Dischargeability of Debt.

As an initial matter, Hanes challenges the Estate's standing to bring a dis-

chargeability action against him. A party objecting to dischargeability of a debt has standing if that party is a "creditor" within the meaning of the Bankruptcy Code. 11 U.S.C. § 523(a); Fed. R.Bankr.P. 4007(a); *see also Ferraro v. Phillips (In re Phillips)*, 185 B.R. 121 (Bankr.E.D.N.Y.1995). The Code defines creditor as an "entity that has a claim against the debtor that arose at the time of or before the order for relief ..." 11 U.S.C. § 101(10)(A). A "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured ..." 11 U.S.C. § 101(5)(A). A "right to payment," and whether an entity is entitled to it, is determined by examining the applicable state substantive law. *Putnam County Savings Bank v. Bagen (In re Bagen)*, 185 B.R. 691, 694 (Bankr.S.D.N.Y.1995).

Under New York Law,[20] an action to surcharge the executor or trustee of an estate for fiduciary misconduct may be brought either by the probate estate or the beneficiaries. *See, e.g., Matter of Estate of Janes*, 165 Misc.2d 743, 630 N.Y.S.2d 472 (Sur.Ct. 1995) (action by executor for surcharge based on alleged imprudence in investment management), *aff'd*, 223 A.D.2d 20, 643 N.Y.S.2d 972 (1996), *aff'd*, 90 N.Y.2d 41, 659 N.Y.S.2d 165, 681 N.E.2d 332 (1997); *Bauer v. Bauernschmidt*, 187 A.D.2d 477, 589 N.Y.S.2d 582 (1992) (action by beneficiary to compel accounting and for surcharge against trustee for mismanagement of trust). Here, the Estate seeks to surcharge the debtor for alleged misconduct in his various fiduciary capacities. Therefore, the Estate has an enforceable claim against Hanes under New York law, and thus, has standing to pursue its dischargeability claims.

19. However, as discussed *infra* in section III, E., under § 523(a)(4) once the Estate met its burden of proving that Hanes was a fiduciary to whom funds had been entrusted, the burden of proof then shifted to the debtor to disprove defalcation.

20. Under Virginia's conflicts' of laws rules, a Federal Court sitting in Virginia will apply the substantive law of the state in which the acts giving rise to the claim occurred. *Hinds v. CompAir Kellogg*, 776 F.Supp. 1102, 1105 (E.D.Va. 1991), *aff'd*, 961 F.2d 211 (4th Cir.1992). In this case, the record is clear and the parties agree that the substantive law of New York applies.

**D. *Section 523(a)(2)(A): Obtaining Money or Property by Fraud.***

■ The Estate asserts that its claim against Hanes is excepted from discharge by section 523(a)(2)(A) of the Code. The Estate's theory is that Hanes obtained pledges and transferred assets from Hope for the benefit of HILP and the DCI Companies through fraud due to false pretenses, false representations and fraudulent nondisclosures which induced Hope and the beneficiaries to consent to his actions. The Estate contends that Hope and the beneficiaries relied upon Hanes' false representations and the Estate lost more than $9.0 million as a proximate result.

Section 523(a)(2)(A) states:

(a) A discharge under section 727 .... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

11 U.S.C. § 523(a)(2)(A).

First we must consider whether the debt sought to be held nondischargeable is a debt for "obtaining money or property." Courts disagree whether a debtor himself must actually receive the money that he has obtained by fraud before nondischargeability can apply. *Compare Lanmark v. Rifkin (In re Rifkin),* 142 B.R. 61, 64–65 (Bankr.E.D.N.Y. 1992) (holding that the debtor *himself* must 'obtain' money by fraud) *with Century First Nat'l Bank v. Holwerda (In re Holwerda),* 29 B.R. 486, 489 (Bankr.M.D.Fla.1983) (holding that the debtor need not actually procure money or property for himself; if the debtor benefits in some way from the property obtained through his deception, the debt is nondischargeable.). Some courts have held that absent the debtor's receipt of a benefit, the debt is discharged. *See McHenry v. Ward (In re Ward),* 115 B.R. 532, 538 (W.D.Mich.1990); *Simmons v. Wade (In re Wade),* 43 B.R. 976 (Bankr.D.Col.1984). Still other courts have found that the debtor need only obtain money by some species of fraud regardless of whether the debtor received a benefit. *See Jacobs v. Mones (In re Mones),* 169 B.R. 246 (Bankr.D.D.C.1994) (stating that the language of § 523(a)(2) is neutral as to the question of whose benefit the debtor obtained the money); *see also Lock v. Scheuer (In re Scheuer),* 125 B.R. 584, 588–89 (Bankr.C.D.Cal.1991).

In the instant case, Hanes devised the family investment plan and used his parents' assets to collateralize loans in favor of HILP and DCI. Hanes was both a general partner and held a beneficial interest in HILP and was a principal of DCI. Thus, although title to the funds remained in the elder Hanes' estates, Hanes "obtained money or property" and benefitted from the loans. *See, e.g., Holwerda,* 29 B.R. at 489 (defendant who was principal of company receiving the loan benefitted and therefore obtained money) (citing *Hyland v. Fink,* 178 N.Y.S. 114, 115 (Sup.App.Term 1919)); *Bates v. Winfree (In re Winfree),* 34 B.R. 879 (Bankr.M.D.Tenn. 1983) (defendant who was principal in real estate project benefitted from money invested by plaintiff in the project); *see also Scheuer,* 125 B.R. at 588 (broker benefitted from money he fraudulently induced client to invest in trading program); *Ashley v. Church (In re Ashley),* 903 F.2d 599, 604 (9th Cir. 1990) (defendant's financial interest in the company "placed him in a position to benefit from any infusion of capital to that enterprise and therefore inducing [plaintiffs] to invest in [the company] was indeed obtaining something for himself").

Having determined that Hanes obtained money or property, we must decide if Hanes obtained his parents' assets by false pretenses, a false representation or actual fraud. It is well established in this Court that in order to prevail in a claim under § 523(a)(2)(A), the plaintiff must establish:

(1) that the debtor made representations;

(2) that at the time of making the representations, the debtor knew they were false;

(3) that the debtor made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations; and

(5) that the creditor sustained loss and damage as a proximate result of the misrepresentations.

*See Clark v. Taylor (In re Taylor)*, 58 B.R. 849, 851–52 (Bankr.E.D.Va.1986) (Bostetter, J.); *Western Union Corp. v. Ketaner (In re Ketaner)*, 154 B.R. 459, 464 (Bankr.E.D.Va. 1992) (Tice, J.); *accord Allstate Life Ins. Co. of N.Y. v. Guerrerio (In re Guerrerio)*, 143 B.R. 605, 611 (Bankr.S.D.N.Y.1992).

### 1. *Fraudulent Concealment or Misrepresentation.*

■ The Estate argues that Hanes committed fraud through both affirmative misrepresentations and nondisclosure of material facts to Hope and the Hanes sisters. Fraud and misrepresentation may be established by a failure to disclose on the part of the debtor where such failure creates a false impression which is known by the debtor. *O'Connor, CPO v. Booker (In re Booker)*, 165 B.R. 164 (Bankr.M.D.N.C.1994); *Peterson v. Bozzano (In re Bozzano)*, 173 B.R. 990, 992 (Bankr.M.D.N.C.1994). "Silence or concealment as to a material fact can constitute a false pretense or a false representation as surely as an overt act." *Shappy v. Scott (In re Scott)*, 201 B.R. 424, 430 (Bankr.E.D.Va. 1996) (quoting *Community Hospital of Roanoke Valley, Inc. v. Musser (In re Musser)*, 24 B.R. 913, 918 (W.D.Va.1982)); *see also Breault v. Berkshire Life Ins. Co.*, 821 F.Supp. 410 (E.D.Va.1993).

■ The Estate argues that Hanes fraudulently concealed information regarding the family investment plan from Hope and his sisters. The Estate's argument is defeated in that the record is replete with memoranda, letters and evidence of family meetings disclosing the actions being taken by the Hanes brothers with regard to their parents' estates. The memoranda set out in detail the family investment plan and the tax benefits contemplated by the brothers. The first of the memoranda specifically states that their parents' assets have been pledged as security for loans to HILP. Later memos disclose the amount of money HILP invested in the DCI Companies and state that the investment would not realize a profit for at least five years. While not every memoranda references the family's exposure or the financial difficulties faced by DCI, much of this information did not become available until sometime in the future. Subsequent memos specifically reference that DCI was operating at a loss and the amount of money invested by HILP.

In addition, many of the memos were sent shortly before scheduled family meetings planned by John and David. At the meetings, the brothers reported on the status of the investments and explained the long term goals of the investment plan. John's sisters, Susan and June, testified that they received all of the memoranda and attended the family meetings.[21] The sisters testified that they were advised of and consented to the family investment plan, but found the information given to them complex and confusing. They further testified that they trusted their brothers, and did not question their judgment and hoped that the plan would work.[22]

More importantly, it is inconceivable that Hope signed the mass of letters, bank documents and trust instruments without understanding what was occurring. Not only did she sign pledge agreements, guarantees, hypothecation agreements, collateral assignments and several amendments thereto for several different banks, but she also sent

---

**21.** John's sister, Cis Mathieson, was not a witness at trial. However, there is no indication in the record that she did not receive the same information provided to June and Susan.

**22.** Susan also testified that she consulted with her business advisor, Robert Deans, regarding the investment plan and in particular, the investment in DCI. The record indicates that Deans attended some of the family meetings and received copies of the memoranda sent by John and David and copies of the documents Susan was requested to sign. There is further evidence suggesting that John and David kept Deans apprised of their actions. In David's February 20, 1990 memo to his sisters he stated: "Sis and Susie–Bob Deans has seen this and understands it, if you want to talk to him." In a letter dated March 1, 1990, from Deans to Susan and Cis regarding refinancing of the newspapers, Deans states: "John is keeping me informed so if you wish to discuss these matters further, please call."

cover letters expressly stating that she understood the transactions and consented to them. John testified that he met with Hope frequently and explained to her what he and David were doing. Margaret Cunningham, Hope's caretaker, confirmed that Hanes frequently visited Hope and hand delivered important documents for her review. Hanes' testimony that he told his stepmother what actions he was taking is further corroborated by the documents she signed subsequent to meeting with him.

The credible evidence indicates that Hope was active in her affairs throughout her life, and concerned with every detail of her finances. The evidence demonstrates that she was very astute and highly successful in her own varied business affairs. Having reviewed the record carefully, we cannot find that Hope was unaware of her sons' activities. The Estate failed to produce any evidence to the contrary.

Next, the Estate maintains that any disclosures that were made to Hope and the Hanes sisters were incomplete and misleading. Again, the evidence adduced by the Estate was unpersuasive. The Estate attempted to take isolated statements made by John or David and characterize them as misleading or false. For example, the Estate questioned Hanes on a statement made in his June 1988 memo telling his sisters that in order to make investments HILP had borrowed money from Hanes, Sr.'s estate and from Hope. On the one hand, the Estate argued that this was a false statement because HILP had not borrowed money from Hanes, Sr.'s estate or from Hope. Rather, HILP had borrowed the money from *banks* and collateralized the loans with their parents' assets. On the other hand, the Estate argued that the memos did not inform the sisters of how much had been borrowed. However, if we accept the Estate's first premise, no money was "borrowed."

Hanes testified that the memos sent to his sisters were not legal memoranda, but memos explaining what was happening so that they would understand. From our reading of the memoranda, we cannot find that they were misleading. In fact, by explaining the situation to the sisters in terms of borrowing

money from their parents, the Hanes brothers were creating a clearer picture for their sisters than just saying the assets collateralized the loans or were hypothecated.

The Estate also argues that John and David's representations that the DCI investment would realize a profit within five years was "patently false." David stated in his October 3, 1989 memo that the DCI Companies were expected to break–even in 1990 with the ability to apply profits to the payment of debt beginning in 1991. John testified that he too had represented to his sisters that 1991 was the target for becoming profitable. John testified that he and David received this projection from the operating managers of the newspapers. Based on the evidence, we find that David's projections and John's optimism regarding the potential for the DCI Companies to become profitable was an expression of opinion, and therefore, cannot support the Estate's claim of false representation. *See Lisk v. Criswell (In re Criswell)*, 52 B.R. 184 (Bankr.E.D.Va.1985) (holding that false representation for purposes of § 523(a)(2)(A) must be one of existing fact and not an expression of opinion).

Likewise, we must reject the Estate's claim that Hanes falsely represented that fees were being paid to Hope in consideration for the pledging of her assets for the benefit of HILP. In a memorandum dated June 18, 1988, Hanes told his sisters that fees were paid to Hope. At the time Hanes sent this memorandum, the fees had not in fact been paid to Hope. Based on the record, this statement standing alone does not amount to a material misrepresentation. For there to be a "material false representation," the representation must be such that a reasonable man would attach importance to the fact misrepresented in determining his choice of action. *Cohen v. Koenig*, 918 F.Supp. 719 (S.D.N.Y.1996). There is no evidence that Hope would not have agreed to the pledging of her assets if she did not receive the fees. In fact, subsequent to this memo, Hope continued to pledge her assets for additional loans without ever receiving a fee. Hanes testified that he and David decided to accrue the fees because Hope did not need any additional taxable income.

Moreover, the fees were eventually paid, albeit three years later, in December 1991.

Additionally, the Estate offered no evidence that Hope or the sisters were denied information. Both Susan and June testified that their brothers kept in touch with them regularly. The family's bookkeepers testified that the accountings were available to both Hope and the Hanes sisters. One of the bookkeepers, Barbara Kushner, testified that she spoke with Hope regularly regarding the accounts. Another bookkeeper, Sherry Dysart, testified that the accountings for all of the accounts were available to any of the sisters or their representatives. In fact, Susan requested the books from Ms. Dysart, and they were sent to her in New York.

Reviewing the record as a whole, we find that the Hanes brothers were diligent and thorough in keeping Hope and their sisters informed of the actions they were taking to implement the family investment plan. Hope knew what her sons were involved in and expressly consented to their activities on numerous occasions. While every detail of the family investment plan was not discussed with the beneficiaries, the brothers maintained open lines of communication with their sisters and did not withhold information. We conclude that the Estate has failed to demonstrate false representation, false pretenses or fraud.

### 2. *Intent to Defraud.*

 Assuming arguendo that the Estate had proven that Hanes made false representations, the Estate failed to prove an intent to defraud. The Estate offered no direct evidence whatsoever that Hanes had an intent to defraud. However, direct evidence is not necessarily required, since courts will often infer such intent from the totality of the pertinent circumstances. *In re Hutchinson,* 27 B.R. 247, 251 (Bankr. E.D.N.Y.1983). In fact, intent to defraud is often established from circumstantial evidence and the inferences that may be deduced from such evidence. *See Hyman Wholesale Corp. v. Allman (In re Allman),* 147 B.R. 122, 125 (Bankr.E.D.Va.1992); *Taylor,* 58 B.R. at 855.

In this case, there was no circumstantial evidence from which we might conclude that Hanes intended to defraud his family. A motive for undertaking a fraud can act as a surrogate for intent, but the only motive the Estate suggested, Hanes' desire to enrich himself and his companies, is factually unsustainable. Taking the record as a whole, it is clear that Hanes' purpose in devising the family investment plan was to avoid estate taxes. The family investment plan devised by John and David included a gifting program through which Hope maximized her statutory gift exemption. The residuary beneficiaries received more than $2.5 million in gifts through the program. Similarly, John and David set up HILP to make investments in which the profits would accrue to the Trust to avoid estate taxes. There is simply no evidence that Hanes was driven by self–interest or preferred his own interest to the interests of his stepmother or his sisters. The evidence was uncontroverted that Hanes invested and lost more than $10 million in personal assets in DCI. We note that he was also a beneficiary and shared equally in any loss to the Estate.

 Moreover, a finding of fraudulent intent may be negated if a debtor has acted openly without any attempt to conceal, but only if that debtor had reasonable grounds to believe that he had a right to possess the property. *See Maneval v. Davis (In re Davis),* 155 B.R. 123, 130 (Bankr.E.D.Va. 1993). Here, the family plan was disclosed to Hope and the Hanes sisters, and they were all aware of Hanes' involvement in the DCI Companies. As discussed *infra,* under the broad authority granted to Hanes by his parents, Hanes had reasonable grounds to believe that his actions were proper. Thus, the Estate's claim of fraud fails because there is no proof of intent to defraud.

### 3. *Causation.*

 Finally, even if we were to adopt the Estate's position that Hanes fraudulently induced Hope to pledge her assets, which is wholly contrary to the evidence, the loss sustained by the Estate was not a proximate result of the representations. At the time that the alleged misrepresentations were

made, Hope had already pledged a portion of her assets. The Estate failed to demonstrate that absent Hanes' representations, Hope would not have pledged her assets or consented to the family investment plan. Furthermore, the Estate failed to demonstrate the materiality and relevancy of the alleged misrepresentations. Consequently, the statements relied upon by the Estate could not be the proximate cause of the loss. *See, e.g., Scott,* 201 B.R. at 431–32 (debtor failed to demonstrate materiality of nondisclosure and how full disclosure would have influenced her actions, particularly in light of her willingness to complete the transaction with full knowledge); *Wilcoxon Construction, Inc. v. Woodall,* 177 B.R. 517, 523 (Bankr.D.Md. 1995) ("To invoke § 523(a)(2), the fraud must have existed at the time of, and been the methodology by which, the money, property or services were obtained.").

### 4. *Summary and Conclusion under § 523(a)(2)(A).*

To summarize, we conclude that Hanes did not fraudulently conceal information from Hope or his sisters, nor did he misrepresent material facts. John and David complied with their duty to diligently inform Hope and their sisters of their activities as co–Executors and co–Trustees in managing their parents' estates. While the disclosures made by John and David were at times complex and optimistic, we cannot extract from the record and articulate any particular, precise evidence supporting the Estate's claim that Hanes obtained property by making false representations with an intent to defraud. Consequently, because the Estate has failed to prove by preponderance of the evidence any false representations, fraudulent concealment or an intent to defraud its claim under § 523(a)(2)(A) is denied.

### E. *Section 523(a)(4): Fraud or Defalcation While Acting in a Fiduciary Capacity: Embezzlement.*

Next, the Estate asserts that its claims are nondischargeable under § 523(a)(4) as arising from Hanes' fraud or defalcation while acting in a fiduciary capacity and embezzlement. The Estate contends that Hanes com-

mitted fraud and/or defalcation by using his parents' assets to make investments in companies in which he had a personal interest. The Estate further contends that these investments were imprudent under New York law. The Estate also argues that Hanes acted beyond the authority granted to him under his father's will by terminating the Marital Trust and creating the Revocable Trust. In addition, the Estate claims that Hanes' use of funds for these purposes constituted embezzlement.

Section 523(a)(4), in relevant part, provides:

(A) A discharge under section 727, . . . of this title does not discharge an individual debtor from any debt;

. . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny; . . .

11 U.S.C. § 523(a)(4).

The term "fiduciary" is interpreted narrowly and applies only to trustees of express or technical trusts. *Taylor,* 58 B.R. at 854. The trustee of an express trust is a fiduciary of the trust beneficiaries. *See Peerless Ins. Co. v. Misiaszek (In re Misiaszek),* 162 B.R. 80 (Bankr.D.N.H.1993). There is no dispute that as co–Trustee of the Marital Trust, Hanes was a fiduciary of the trust beneficiaries. Although we are hesitant to extend the technical trustee requirement, under the facts of this case we find that Hanes was "acting in a fiduciary capacity" for purposes of § 523(a)(4) in his capacities as co–Executor of his father's estate and attorney–in–fact for his parents as well. *See In re Reed,* 155 B.R. 169, 172 (Bankr. S.D.Ohio 1993)(stating that debtor acting as administrator in probate estate in West Virginia was clearly acting in a fiduciary capacity); *In re Wilson,* 127 B.R. 440, 443 (Bankr. E.D.Mo.1991) (finding that debtor who was fiduciary of grandmother's conservatorship and probate estate was "acting in a fiduciary capacity"); *In re Barwick,* 24 B.R. 703, 705–06 (Bankr.E.D.Va.1982) (applying Virginia law as to power of attorney in evaluating § 523(a)(4) claim); *but see In re Lang,* 108 B.R. 586, 589 (Bankr.N.D.Ohio 1989) (mere appointment as attorney–in–fact in subscrip-

tion agreement arose from ordinary commercial transactions, not a technical trust).[23] The paramount issue here is whether while acting in that capacity Hanes committed a fraud or defalcation.

### 1. Fraud while Acting in a Fiduciary Capacity.

■■■ For purposes of § 523(a)(4), "fraud" means actual fraud involving intentional deceit, rather than implied or constructive fraud. 4 Collier on Bankruptcy, § 523.10[1][a], at 523–70 (15th rev. ed.1997); *In re Tripp*, 189 B.R. 29 (Bankr.N.D.N.Y. 1995). As we concluded above in our § 523(a)(2)(A) analysis, the record is devoid of any evidence that Hanes acted with the requisite intent to defraud his stepmother or his sisters. *See Renz v. Beeman*, 589 F.2d 735, 749 (2d Cir.1978) ("To make a case of fraud, it would have been necessary to show that the [trustees] intentionally sought to defraud the trust beneficiaries."). We turn next to whether Hanes committed defalcation.

### 2. Defalcation while Acting in Fiduciary Capacity.

■■■ Federal law defines what constitutes defalcation. The Fourth Circuit has stated that defalcation under § 523(a)(4) is "misappropriation of trust funds or money held in any fiduciary capacity; or the failure to properly account for such funds." *Pahlavi v. Ansari (In re Ansari)*, 113 F.3d 17, 20 (4th Cir.1997) (quoting Black's Law Dictionary 417 (6th ed.1990)). " 'A defalcation for purposes of this statute does not have to rise to the level of 'fraud,' 'embezzlement,' or even 'misappropriation.' " *Id.* Since debts arising from breaches of ordinary care are normally dischargeable in bankruptcy and exceptions to discharge are strictly construed in favor of the debtor, some degree of culpability is required to make a debt nondischargeable as a defalcation. 4 Collier on Bankruptcy 523.10[b], 523–71 (citing *Central Hanover*

*Bank and Trust Co. v. Herbst*, 93 F.2d 510, 512 (2d Cir.1937) (Learned Hand, J.) (" 'defalcation' may demand some portion of misconduct; we will assume arguendo that it does")). Thus, a mere breach of a fiduciary duty without more does not amount to defalcation under § 523(a)(4). *See Kayes v. Klippel (In re Klippel)*, 183 B.R. 252, 259 (Bankr. D.Kan.1995) ("a breach of a general state law fiduciary duty will not support excepting a claim from discharge under § 523(a)(4)"); *cf. Meyer v. Rigdon*, 36 F.3d 1375, 1385 (7th Cir.1994) (reviewing the "perplexing defalcation question" and concluding that a mere negligent breach of a fiduciary duty is not defalcation under section 523(a)(11)). However, when a debtor has been acting as a trustee, the debtor is responsible for knowledge of the fiduciary responsibilities and may not cite mere ignorance as a defense to an objection to · dischargeability. *See In re Richardson*, 178 B.R. 19 (Bankr.D.D.C.1995); *see also Hodnett v. Loevner (In re Loevner)*, 167 B.R. 824 (Bankr.E.D.Va.1994).

■■ While federal law defines what constitutes a defalcation, we must refer to state law to determine whether the debtor is indebted to the plaintiff for conduct which constitutes defalcation. *See Cappella v. Little (In re ˋLittle)*, 163 B.R. 497, 499 (Bankr. E.D.Mich.1994); *In re Interstate Agency*, 760 F.2d 121, 124 (6th Cir.1985) (interpreting § 17(a)(4) of the former Bankruptcy Act); *see also Grogan v. Garner*, 498 U.S. 279, 283–84, 111 S.Ct. 654, 657–58, 112 L.Ed.2d 755 (1991). Furthermore, under both state and federal law the burden of disproving defalcation rests on the debtor/fiduciary. *Cappella*, 163 B.R. at 500 (stating that because a trustee has a duty to account under state law, it is only logical that the debtor/trustee must prove that no defalcation occurred, i.e., that he be required to account for the trust funds he received).

■■ Thus, the Estate's burden of proof was to establish that Hanes was a fiduciary

---

**23.** In this case, the majority of Hanes' actions were taken in furtherance of his duties as Trustee of the Marital Trust. To the extent that these actions were also taken in his other capacities, the duty of care owed by Hanes is unchanged. Because the gravamen of the Estate's allegations

focus on Hanes' conduct in terms of his capacity as Trustee of the Marital Trust, we will his examine his conduct in that capacity, recognizing that he was also acting, at times, as Executor of Hanes, Sr.'s estate and under the powers of attorney.

to whom funds had been entrusted. We conclude from the record that the Estate satisfied this burden. The burden then shifted to Hanes to account fully for all funds received for the benefit of the beneficiaries by adducing evidence that he complied with his fiduciary duties with respect to all questioned transactions. *See Otto v. Niles (In re Niles),* 106 F.3d 1456, 1460–61 (9th Cir.1997); *see also In re Manzo,* 106 B.R. 69, 72–73 (Bankr.E.D.Pa.1989) ("Once the plaintiff establishes that the trust res was delivered to the fiduciary, the burden shifts to the debtor to show that no defalcation occurred."); *In re Borbidge,* 90 B.R. 728, 736–37 (Bankr. E.D.Pa.1988), *aff'd,* 114 B.R. 63 (E.D.Pa. 1990) (same); *Rhodes v. Little Falls Dairy Co.,* 230 A.D. 571, 245 N.Y.S. 432 (1930), *aff'd without opinion,* 256 N.Y. 559, 177 N.E. 140 (1931) (stating that obligation to render an accounting is triggered by proof that plaintiff entrusted property to defendant in fiduciary relationship). It is under this framework that we examine Hanes' conduct as Trustee of the Marital Trust under New York law.

### a. Hanes Did Not Breach the Duty of Undivided Loyalty.

The Estate argues that Hanes breached his duty of undivided loyalty by investing trust assets in the DCI Companies. Under New York trust law, as in most jurisdictions, a trustee generally has a duty of undivided loyalty to the beneficiaries of a trust. *City Bank Farmers Trust Co. v. Cannon,* 291 N.Y. 125, 131, 51 N.E.2d 674 (1943). The rule of undivided loyalty requires that a trustee "must not, under any circumstances, place himself in a position whereby his personal interests will come in conflict with the interest of his beneficiary." 61 N.Y. Jur. Trusts § 295, at 491 (1968). Describing the rule, the New York Court of Appeals has stated:

> This is a sensitive and "inflexible" rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty.

*Birnbaum v. Birnbaum,* 73 N.Y.2d 461, 541 N.Y.S.2d 746, 748, 539 N.E.2d 574, 576 (1989), (quoting *Matter of Ryan,* 291 N.Y. 376, 407, 52 N.E.2d 909 (1943)). The rule prohibits both self–dealing and conflicts of interest. Thus, the rule of undivided loyalty mandates that a trustee must neither deal with trust property for the benefit of himself nor place himself in a position inconsistent with the interests of the trust.

We agree with the Estate's contention that Hanes engaged in self–dealing and conflict of interest by investing in DCI. Self–dealing occurs where a trustee invests in a company in which he has a personal interest. Similarly, a conflict of interest arises when a trustee purchases stock or securities for the trust in a corporation in which he has a substantial personal interest. In this case, Hanes was both a general partner of HILP and held an interest in some of the DCI Companies. He was also Chairman of the Board for all of the DCI Companies. Hanes invested not only his personal capital in DCI, but also his personal pride, making it difficult to remain loyal to the trust. Thus, we conclude that Hanes engaged in self–dealing and had a potential conflict of interest.

Nevertheless, Hanes was relieved of his duty of loyalty by the express terms of the Marital Trust and the express consent of Hope and his sisters. A trust settlor may relieve a trustee of this duty of loyalty by affirmatively condoning self–interested transactions. *See O'Hayer v. de St. Aubin,* 30 A.D.2d 419, 293 N.Y.S.2d 147 (1968); *Matter of Balfe's Will,* 245 A.D. 22, 280 N.Y.S. 128 (1935). A trustee's duty of loyalty can be reduced by means of language in the trust instrument permitting certain transactions involving self–interest, *Id.,* or by express consent of the settlor. *Central Hanover Bank & Trust Co. v. Russell,* 290 N.Y. 593, 48 N.E.2d 704 (1943). Express language in the trust instrument or consent reduces the standard of duty to good faith and permits the court to weigh the merits of the transaction. *See Balfe's Will,* 280 N.Y.S. at 129; *Renz,* 589 F.2d at 744; *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 972 (2d Cir.1989).

In the instant case, the Marital Trust expressly permitted the Trustees to engage in

self-interested transactions.[24] Hanes, Sr.'s will allows the Trustees to "make or continue any investment regardless of whether any Trustee acting hereunder, whether individual or corporate, is interested in or connected with the issuing corporation, association or other entity as a stockholder, director, officer, manager, employee or other otherwise." By this explicit language, Hanes Sr. expressly authorized his Trustees to invest in entities in which they have a personal interest. *See, e.g., Matter of Hubbell's Will,* 302 N.Y. 246, 255, 97 N.E.2d 888 (1951); *O'Hayer,* 293 N.Y.S.2d at 151–52 [25] (trust instrument expressly gave the trustees power to engage in self–dealing in the stock of the corporation whose shares comprised the corpus of the trust); *Balfe's Will,* 280 N.Y.S. 128 (will expressly authorized the trustee to act with respect to securities in the estate without regard to whether or not the trustee had a personal interest in these same securities or the companies to which they related); *but see Renz,* 589 F.2d at 744 (trust instrument did not authorize self–dealing where it merely conferred power to act 'with all the authority, and powers' of the testator). Thus, we conclude that the Trust, in substance, authorized Hanes to invest in companies in which he had a personal interest.

Moreover, we find that Hope and the Hanes sisters expressly consented to Hanes' self–dealing. The evidence adduced at trial demonstrates that Hope was well aware that Hanes had a personal interest in DCI. Hanes testified that he and David explained everything to her, and that she was very interested in the newspaper investment.[26] As discussed above, the documentary evidence conclusively establishes Hope's consent to Hanes' actions. Hope's knowledge and recognition of Hanes' involvement in DCI are shown by Hope's repeated ratification and approval of the transactions made by Hanes for the benefit of DCI.[27] We find that the evidence presented by Hanes indicates that Hope consented with full knowledge.

Additionally, on the record before us, we cannot find that the Hanes sisters did not consent to Hanes' self–dealing. Both Susan and June testified that they were aware of their brother's involvement in the newspapers. They were provided a wealth of information regarding the family investment plan and signed off on all of the documents consenting to various transactions. Although the information provided was often complex, we find that Hanes' acted in good faith and sufficiently provided his sisters with information regarding his actions. *See Flaum v. Birnbaum,* 120 A.D.2d 183, 508 N.Y.S.2d 115 (1986) (stating that fiduciaries must show that they acted in good faith and volunteered information to the beneficiaries). Recognizing that consent to self–dealing must be

---

**24.** Similar language is also contained in the powers of attorney and the Masemer Trusts.

**25.** In *O'Hayer,* the trust instrument declared that it was the strong intent of the settlor that both he and his son, whom he appointed trustee, profit from the trust. 293 N.Y.S.2d at 149. The daughter, a beneficiary under the trust, brought suit against her brother's estate requesting the estate be surcharged for various breaches of trust committed by her brother. At issue were various self–dealings by the brother buying from the trust just enough stock in the corporations comprising the corpus of the trust to become a majority stockholder over his sister. The court upheld the trustee/brother's purchase of the corporate stock from the trust corpus. The court explained that it was the blatant and specific intention of the settlor/father as evidenced by the language of the trust instrument, that his son be able to purchase the stock and that this language properly exonerated the son from liability for what would have otherwise been a breach of the duty not to self–deal. *Id.* at 151–52.

**26.** Susan testified that "Hope had a romantic notion about the newspapers."

**27.** There are several letters in the record from Hope that expressly demonstrate her consent to the family investment plan and John's involvement in DCI. *See, e.g.,* letter to David in December 1989 stating that she was "very appreciative of the hard work you have undertaken in [sic] behalf of the whole family, and your willingness to devote your full time to this effort;" letter dated February 9, 1990 to Sovran Bank, "I am the mother of one of the individual Borrowers, and by virtue of that relationship I am interested in the welfare of such Borrower and the corporate Borrowers of which he is a shareholder, and I therefore have received good and adequate consideration for my undertakings under the Pledge Agreement;" letter dated May 21, 1991 to BONY, "I consent to and approve of the execution and delivery of the Pledge Agreement by the Trustees of the Trust to the Bank and hereby ratify the same in all respects."

made with full knowledge of all the material particulars and circumstances, we find that Hope and the Hanes sisters expressly consented to Hanes' self–dealing. *See Central Hanover Bank & Trust Co.,* 48 N.E.2d 704; *but see Renz,* 589 F.2d at 743 (holding that facts did not support a finding of implied consent). Therefore, Hanes cannot be liable for a breach of trust based on self–dealing or conflict of interest because Hope expressly authorized and ratified the pledging of her assets and the investments in DCI. *See In re Cavagnaro's Estate,* 78 N.Y.S.2d 249 (Sur.Ct. 1947) (stating that where beneficiary of testamentary trust expressly authorized and ratified trustee's investments, beneficiary's personal representative, after beneficiary's death, could not recover from trustee for alleged breach of trust in making such investments).

[35] Furthermore, where the settlors themselves create a conflict of interest, a trustee cannot be liable for violation of the duty of undivided loyalty. *See Balfe's Will,* 280 N.Y.S. 128; *In re Farrell's Will,* 91 N.Y.S.2d 89 (Sur.Ct.1949). Hanes' dual roles as executor, trustee and attorney–in–fact as well as beneficiary placed him in a position that invited conflict of interest. Such conflict of interest was created not by Hanes, but by the settlors themselves. As concluded above, Hope was aware of Hanes' potential conflict and she was content to let Hanes serve in his multiple capacities despite the distinct possibility of conflict between his duties as Trustee, general partner of HILP and principal of DCI. *See Renz,* 589 F.2d at 745. It is generally held that in such a situation, the undivided loyalty rule does not apply. *See generally,* 90 C.J.S. Trusts § 248(e) (stating that "[b]y the terms of the trust, the trustee may be permitted to do what, in the absence of such provision in the trust instrument, would

be a violation of his duty of loyalty; and within limitations, the trustee may be authorized by the trust instrument to act in matters involving a divided interest."). Thus, no breach of duty can be inferred from Hanes' dual roles. *See, e.g., Renz,* 589 F.2d at 746; *In re Farrell's Will,* 91 N.Y.S.2d 89 (Sur.Ct. 1949) (where the trustee's dual relationship with respect to trust property was created not by the trustee, but by the act of the settlor in appointing such person as trustee with knowledge of his other interest in the property, transactions engaged in by the trustee, acting with prudence and diligence, are not invalid); *accord Balfe's Will,* 280 N.Y.S. 128; *see also Rosencrans v. Fry,* 12 N.J. 88, 95 A.2d 905 (1953); *In re Flagg's Estate,* 365 Pa. 82, 73 A.2d 411 (1950); *In re Steele's Estate,* 377 Pa. 250, 103 A.2d 409 (1954).

■ The language of the Marital Trust coupled with Hope's consent to Hanes' actions lead us to conclude that the discretion accorded to Hanes relieved him of his duty of loyalty. In a situation such as exists here, while we are not required to apply the undivided loyalty rule, we must scrutinize the transactions complained of with extreme care in order to be satisfied that the trustee in exercising the plenary power conferred upon him has acted in the utmost good faith toward all the beneficiaries. We turn then, to the investments made by Hanes.

### b. The Investments made by Hanes were not Imprudent.

■ The Estate complains that regardless of whether the Trust permitted Hanes to invest in companies in which he had an interest, his decision to invest in DCI was imprudent. The argument is based on the Prudent Person Rule.[28] Under this rule, the standard

---

28. Hanes, Sr. attempted to exonerate his trustees of their duties under the Prudent Person Rule. Paragraph Eighth of Hanes, Sr.'s will specifically provided that the Trustees

"shall have, without limiting any power or authority which they would otherwise possess by law, full power and authority * * * to invest and reinvest any property at any time forming part of the trust corpus in such securities or other property, real or personal, as they shall in their sole discretion, deem advisable *without*

*regard to whether any such security or other property is the kind of investment permitted by law for trust funds."*
This language is clear. Hanes, Sr. did not want his sons' ability to invest his assets to be limited by the laws governing trust investments. However, under New York law, exoneration clauses in wills or testamentary trusts for failure to exercise prudence are void as contrary to public policy. *See* N.Y. Est. Powers & Trust Law § 11–1.7 (McKinney 1967); *see also Stark v. U.S. Trust*

of conduct owed by a trustee is to be diligent and prudent, and to exercise that degree of care which prudent men of discretion employ in like matters of their own.[29] *See King v. Talbot*, 40 N.Y. 76, 85–86 (1869); *Matter of Bank of New York*, 35 N.Y.2d 512, 364 N.Y.S.2d 164, 323 N.E.2d 700 (1974); *Matter of Bankers Trust*, 62 N.Y.2d 821, 477 N.Y.S.2d 604, 466 N.E.2d 144 (1984); *Bauer v. Bauernschmidt*, 187 A.D.2d 477, 589 N.Y.S.2d 582; *see also* N.Y. Est. Powers & Trusts Law § 11–2.2[a][1] (McKinney 1967).

■■■■ In the substantial body of New York law governing the duties and responsibilities of trustees with regard to investments, a number of fundamental principles have evolved in examining investments in light of this Rule. It is clear that a trustee is neither insurer nor guarantor of the value of a trust's assets. *McCabe v. Fowler*, 84 N.Y. 314, 318 (1881); *Matter of Cady's Estate*, 211 A.D. 373, 207 N.Y.S. 385, 387 (4th Dep't 1925). A trustee's performance is not judged by success or failure. *Matter of Clark's Will*, 257 N.Y. 132, 136, 177 N.E. 397 (1931) ("it is impossible to say that trustees are wanting in sound discretion 'simply because their judgment turned out wrong.' ") (*quoting Green v. Crapo*, 181 Mass. 55, 58, 62 N.E. 956, 957 (1902) (Holmes, Jr.)). The conduct of a fiduciary is to be judged by the facts that he knew or should have known at the time the investment decision was made. *Bank of New York*, 35 N.Y.2d at 519, 364 N.Y.S.2d 164, 323 N.E.2d 700. "It is not sufficient that hindsight suggests that another course of action would have been more beneficial." *Id.* at 519, 364 N.Y.S.2d 164, 323 N.E.2d 700. New York courts do not hold a trustee to "prescience in investment decisions." *Bank of New York*, 35 N.Y.2d at 519, 364 N.Y.S.2d 164, 323 N.E.2d 700, (citing *Matter of Hubbell's Will*,

Co. of N. Y, 445 F.Supp. 670, 683 (S.D.N.Y. 1978). Section 11.1.7 of the New York statute is strictly construed by New York courts. In *In re Allister*, 144 Misc.2d 994, 545 N.Y.S.2d 483 (Sur. Ct.1989), the trust instrument allowed the trustee to retain any property within the Estate "in his uncontrolled discretion ...." and "irrespective of whether the same may be authorized by the laws of the State of New York ..." The surrogate's court found that both provisions violated EPTL § 11–1.7 and were offensive to public policy. Id. 545 N.Y.S.2d at 486–87.

302 N.Y. 246, 257, 97 N.E.2d 888). Fiduciaries "are not required to foresee the future of investments in this or that particular enterprise." *Matter of Cowles' Will*, 22 A.D.2d 365, 255 N.Y.S.2d 160, *aff'd*, 17 N.Y.2d 567, 268 N.Y.S.2d 327, 215 N.E.2d 509, (quoting *Matter of Hubbell's Will*, 302 N.Y. at 257, 97 N.E.2d 888.) "A wisdom developed after an event and having it and its consequences as a source is a standard no man [sic] should be judged by." *Costello v. Costello*, 209 N.Y. 252, 262, 103 N.E. 148. In short, the test is one of conduct rather than performance. *In re Morgan Guaranty Trust Co.*, 89 Misc.2d 1088, 396 N.Y.S.2d 781 (1977). Therefore, evidence of losses following the investment decision does not, by itself, establish imprudence. *Matter of Cuddeback's Estate*, 168 Misc. 698, 702, 6 N.Y.S.2d 493 (Sur.Ct.1938).

■■■ Moreover, under New York law, a fiduciary has no absolute duty to diversify and a failure to diversify is not, by itself, imprudent. *See, e.g., Matter of Newhoff*, 107 Misc.2d 589, 435 N.Y.S.2d 632 (1980); *Matter of Kellogg's Trust*, 35 Misc.2d 541, 230 N.Y.S.2d 836 (1962); *Matter of Kilmer's Will*, 18 Misc.2d 60, 186 N.Y.S.2d 120 (1959). The New York Court of Appeals has stated that:

"The record of any individual investment is not to be viewed exclusively, of course, as though it were in its own water–tight compartment, since to some extent individual investment decisions may properly be affected by considerations of the performance of the fund as an entity, as in the instance, for example, of individual security decisions based in part on considerations of diversification of the fund or of capital transactions to achieve sound tax planning for the fund as a whole."

**29.** The new version of this rule, the prudent investor rule, is not applicable to the accounting period at issue in this case. The new rule was not adopted in New York until 1995, well after the transactions at issue in this case took place. The prudent investor rule provides for greater flexibility in individual investments because of the recognition that consideration should be given to the portfolio as a whole. See Restatement (Third) of Trusts § 227.

*Bank of New York,* 364 N.Y.S.2d at 168, 323 N.E.2d at 703.

■ In this case, Hanes along with Peter Labovitz formed DCI Publishing, Inc. in 1986. After 1986, Hanes and Labovitz acquired a number of publications, operated by separate corporations collectively called the "DCI Companies." The objective of the company was rapid growth by means of the acquisition of existing free distribution weekly newspapers in communities in Northern Virginia and Suburban Maryland, and by means of start–ups of newspaper in these same areas. Hanes made the first investment of family assets in DCI in early 1987. Hanes testified that the investment in DCI was made upon due diligence and reasonable economic projections. He considered the investment a vehicle by which to further the family investment plan by purchasing companies that were operating at a loss and then making them profitable. The profits from any investment would accrue to the Trust thereby avoiding estate taxes. He regarded these as desirable investments for the Trusts' purposes.

Hanes presented ample evidence to support his belief that DCI was a solid investment for the family investment plan. Gannett News had offered to purchase the newspapers for $22.5 million. In early 1991, the Washington Times stepped in and provided financing while negotiating a deal to form an alliance with DCI. Tony Webb testified that an agreement had been reached between the Times and DCI in October 1991. Webb testified that the Times considered DCI a very valuable acquisition, and that small newspapers were considered "premium." In the fall of 1992, the Times pulled out of DCI. Webb testified that DCI had begun a turnaround showing positive cashflows for several consecutive months. Since the Times had been operating DCI for almost a year, Hanes was unable to save the investment. DCI subsequently filed bankruptcy in January of 1993.

From our examination of the record, we are convinced that Hanes' decision to invest in DCI was in good faith and reasonable for a family partnership created as a tax planning device. The decision was made to achieve sound tax planning for the fund as a whole. *See Bank of New York,* 364 N.Y.S.2d at 168, 323 N.E.2d at 703. To the extent that a large concentration of the Trust assets were invested in DCI, Hanes failed to diversify the assets. However, based on the facts here, we cannot find that Hanes' decision to invest the majority of the assets in a high risk investment was imprudent as a matter of law. We similarly do not find that his retention of the investment during a period of decline was negligent. *See Stark,* 445 F.Supp. at 679. Hanes' projection for profit from the time of the investment was five years. The evidence demonstrated that the newspapers' losses had dramatically decreased from 1989 through 1991. Hanes retained the concentration on that basis with the hope that he would be able to sell the papers at a large profit once the papers started to show a profit.

While the losses suffered by the beneficiaries are unfortunate, we cannot find the losses were a result of any wrongdoing or negligence on the part of Hanes. *See Matter of Estate of Donner,* 82 N.Y.S.2d 574, 606 N.Y.S.2d 137, 626 N.E.2d 922 (1993) (stating that a fiduciary will be surcharged only for losses resulting from negligent inattentiveness, inaction or ill–consideration); *see also Matter of Wood,* 177 A.D.2d 161, 581 N.Y.S.2d 405 (1992). We are satisfied that Hanes' conduct with regard to the DCI investment was not negligent or deficient. *See Bankers Trust Co.,* 636 N.Y.S.2d at 745 (trustee's investment held not negligent where its conduct was not deficient). Hanes' foresight may not measure up to the Estate's hindsight, but hindsight is not the test of a trustee's diligence. Consequently, the poor financial performance of the newspapers cannot be the basis of a finding of imprudence. *See Wood,* 581 N.Y.S.2d at 408. Thus, based on our review of the record, we are satisfied that Hanes exercised reasonable judgment and diligence in his investments. *See In re Clark's Will,* 280 N.Y. 155, 19 N.E.2d 1001 (1939) (finding that unless it can be shown that the trustee abused the discretion given to him by the testator, his decision must be respected). Accordingly, the investment in DCI does not represent misconduct which

justifies a surcharge or which amounts to defalcation.

### c. Hanes Did Not Breach His Fiduciary Duties by Pledging Assets to Third Parties or by Terminating the Marital Trust.

The Estate's next theory of breach is that Hanes acted beyond his authority. The Estate contends that the Trustees of the Marital Trust lacked the authority to pledge assets of the Marital Trust as collateral for loans to HILP or DCI and that Hanes improperly terminated the Marital Trust. Based upon the express language of Hanes, Sr.'s will and the powers of attorney, we must reject the Estate's arguments. Article Fourteenth of the will of Hanes, Sr., authorizes the executors and trustees:

(6) to lend money to any beneficiary hereunder, either with or without security and on such other terms as my executors may deem appropriate; ·

(7) to borrow money from anyone (including any individual or corporation serving in a fiduciary capacity hereunder) and to secure the repayment thereof by mortgage or pledge of any property;

(22) generally to exercise in respect to any property any power which an absolute owner of such property would have.

In addition, the powers of attorney granted the Hanes brothers the power:

(11) to borrow money in such amounts as said Attorney shall deem advisable, and to execute therefor notes, bonds or other obligations on such terms as said Attorneys shall deem advisable;

(12) to give security for any money so borrowed by the mortgage or pledge of any of my property and to execute, acknowledge and deliver such instruments as said Attorneys shall deem appropriate to make such mortgage or pledge effective.

The language of the above provisions expressly permits lending to the beneficiaries and the pledging of any assets to secure borrows. The principal beneficial owners of HILP through the Masemer Trusts, were the five children of Hanes, Sr. The presumptive remaindered under the Marital Trust and the beneficiaries of Hope's estate were the same five children. Thus, a loan to HILP was in essence a loan to the beneficiaries. Rather than obtain loans from banks directly to the beneficiaries, the Hanes brothers achieved the same result by obtaining loans for HILP.

Concededly, the loans to the DCI Companies are a more difficult question. However, the express provisions of paragraphs (6) and (7) coupled with paragraph (22) and the authority granted under the power of attorney indicate Hanes, Sr.'s intention to give his sons unfettered discretion with regard to managing the Marital Trust as if they were the "absolute owners thereof." While absolute discretion "does not mean ... that it might be recklessly or willfully abused," *Carrier v. Carrier*, 226 N.Y. 114, 123 N.E. 135 (1919), the express provisions of a trust provision must be read in light of the intention of the settlor. *Clark's Will*, 280 N.Y. at 160, 19 N.E.2d 1001.

Viewing the instruments and the circumstances as a whole, we find that it was Hanes, Sr.'s intention to give his sons broad authority to manage the Marital Trust in their absolute discretion. The family investment plan was a proper function of Hanes' duties as Trustee. To the extent that the DCI Companies were investments made by HILP in furtherance of the family investment plan, the pledges securing lending directly to these entities was authorized.

Moreover, the Estate cites no authority supporting its notion that the pledges to DCI could not be enforced by the lenders. Having conducted independent research, we find little case law on this point, but it appears that the rule in New York, at the very least, is contrary to the Estate's position. *See, e.g., In re Hammer's Will*, 16 A.D.2d 111, 225 N.Y.S.2d 868 (1962), *aff'd*, 12 N.Y.2d 893, 237 N.Y.S.2d 1001, 188 N.E.2d 266 (1963) (settlor's guarantee on a line of credit to a third party held collectible from the trust).

Likewise, the Estate's claim that the termination of the Marital Trust and the creation of the Revocable Trust were unauthorized is unfounded. Article Tenth (A) of the Hanes, Sr.'s will, which created the Marital Trust provided, in pertinent part:.

My trustees shall also pay to my wife at any time or times so much, if any, of the principal of the Marital Trust as my trustees shall, in their *absolute discretion,* deem necessary or advisable for her maintenance, welfare and comfort or to enable her to make gifts and pay any gift taxes thereon. The discretionary powers granted by the foregoing sentence of this Article shall be exercised with *primary* regard for the interests of my wife rather than for remainder or other successor interests. In connection with the exercise of such powers, my trustees shall be justified in relying conclusively on any information furnished to them by my wife.

(emphasis added.). The language utilized in this paragraph demonstrates that Hanes, Sr. intended to establish broad provisions for the invasion of principal for Hope's maintenance, welfare and comfort or to enable her to make gifts. The discretion of the Trustees to invade the principal is unrestricted. Where no condition of need is attached or intended, the gift of principal is as broad as the gift of income. *Matter of Bisconti's Will,* 306 N.Y. 442, 119 N.E.2d 34 (1954); *see also In re Flyer's Will,* 23 N.Y.2d 579, 297 N.Y.S.2d 956, 245 N.E.2d 718 (1969); *Clark's Will,* 280 N.Y. at 160, 19 N.E.2d 1001. However, where the payment of principal rests on the uncontrolled discretion of the trustee, he must not in exercising his authority, act dishonestly or with an improper motive. Restatement of Trusts (Second) § 187, Comment e; *Flyer's,* 23 N.Y.2d 579, 297 N.Y.S.2d 956, 245 N.E.2d 718; *Clark's Will,* 280 N.Y at 160, 19 N.E.2d 1001 (finding less expan-

sive language in trust instrument sufficient to confer the power to terminate trust).

We cannot discern any evidence which supports the notion that Hanes' purpose in terminating the Marital Trust and creating the Revocable Trust was to permit self–dealing. Hanes testified that his reasons for terminating the Marital Trust and forming a new trust were solely to appease BONY's concerns with respect to their security interest. The DCI loans were due to mature, and BONY was threatening to seize the trust assets rather than extend the loans absent express language authorizing the pledges of assets for the benefit of third parties.[30] To avoid this situation, and any subsequent litigation the new trust was formed containing the express language required by BONY.[31]

In addition, Hope consented to the termination of the Marital Trust. Hanes and Mitchell met with Hope and explained BONY's "technical" concerns. Hope executed all of the documents terminating the Marital Trust and forming the Revocable Trust.[32] The Revocable Trust appointed Hope and Hanes as co-Trustees. To reiterate, there is no evidence in the record that supports even an inference that Hope would sign all of the documents and become a Trustee without understanding the purpose of the transaction. Since it cannot be said that Hanes abused his discretion when he invaded the principal of the Trust, interference with his judgment would be improper. *See Bisconti's,* 306 N.Y. 442, 119 N.E.2d 34; *Clark's,* 280 N.Y. 155, 19 N.E.2d 1001.

---

**30.** If BONY had seized the assets of Hope and the Marital Trust, the transfer would have been treated as a gift subject to an estimated 65 % gift tax.

**31.** Hanes testified that he believed creating the Revocable Trust was the proper choice because he would not have considered challenging the pledges. In this regard, Hanes stated:

in addition to his rather legendary business career, my father's word was legendary, and its validity. My stepmother was very proud of this. I guess all of us were. I would have had to go to my stepmother and say, "Look, we borrowed money from a bank. We owe it to them. They lent us the money. They lent it to us in good faith. We gave them collateral. They took it in good faith. However, we have

this legal gimmick whereby maybe we could bilk the bank out of this and walk away from this obligation of ours." I can tell you that if I ever went to her with something like that, I know one thing which would occur, and that is, she'd never want to talk with me again, and I wouldn't blame her ... The suggestion that my stepmother would ever countenance such a thing is an insult to everything she stood for and I think a dishonor to her name. That is the fundamental reason why it never occurred to me ...

**32.** Mitchell also sent a detailed memorandum to the Hanes sisters explaining BONY's concerns and the purpose for terminating the Marital Trust. The sisters signed the consents permitting termination of the Marital Trust.

#### d. Hanes Accounted for all of the Trust Funds.

■ Finally, and perhaps most telling on the question of whether Hanes committed a defalcation, is whether Hanes accounted for all of the funds entrusted to him. In that regard, Hanes presented uncontroverted evidence that all of the funds that went in or out of the Trusts and the Custody Accounts were accounted for. Sherry Dysart and Barbara Kushner, the bookkeepers hired by Hanes who kept the books for Hope's accounts and the Trust accounts, each testified that Hanes kept meticulous records and that every penny was accounted for in the books produced. Ms. Dysart testified that the bookkeepers kept professional double entry accountings for the custody accounts, the related trust and estate accounts, and for the HILP account. She stated that "[e]very penny that went into and out of every cash account, including the custody accounts, is accounted for."

Further, we are satisfied with Hanes' explanation regarding the loss of funds. It is undisputed that Hanes terminated the commitment of family funds to the DCI investment as of July 1990. Thereafter, Hanes committed over $10 million in personal assets in attempt to save the investment. Early in 1990, Hanes diligently negotiated deals in an effort to sell the newspapers. The evidence that Gannett News had offered to purchase DCI for $22.5 million dollars was unchallenged. The deal fell through, but in the Spring of 1991, Hanes was optimistic that the recession had passed and that the papers were going to be rescued by the Washington Times deal. To accomplish this goal, Hanes began retiring debt with the hope that the assets acquired would attain value as the fortune of the newspapers improved. In an effort to reduce the risk of gift taxation by the IRS, Hanes purchased notes upon which Hope was already obligated. We find that Hanes' actions were reasonable under these circumstances. No inequitable conduct has been shown. Hanes has accounted for the loss suffered by the Estate and established that the loss was not attributable to any misconduct on his part.

Like our analysis under § 523(a)(2)(A), even assuming arguendo that Hanes' actions amounted to defalcation the loss suffered by the Estate was not attributable to Hanes' alleged misconduct. *See Tucker v. Nestor (In re Nestor)*, 202 B.R. 181 (D.Mass.1996) (holding that even if debtor committed defalcation, debt to creditor did not arise from defalcation, and thus did not come within discharge exception under § 523(a)(4)); *see also Matter of Hahn*, 93 A.D.2d 583, 462 N.Y.S.2d 924, 927, *aff'd*, 62 N.Y.2d 821, 477 N.Y.S.2d 604, 466 N.E.2d 144 (1984) ("To warrant a surcharge, the objectors must show that the trust's losses resulted from the trustee's negligence or failure to exercise such prudence.").

In sum, there is no evidence supporting a finding that Hanes was negligent or engaged in any misconduct that would justify a finding of defalcation. Hanes met his burden of production in showing that he did not misuse any funds entrusted to him or act beyond the authority granted to him by his parents. The Marital Trust gave him broad investment powers and expressly gave him the authority to invest in companies in which he had an interest. In addition, Hope consented to or ratified the transactions entered into by Hanes. The investment in DCI, while it ended unfortunately, was not imprudent at the time it was made.

Furthermore, the termination of the Marital Trust and the creation of the Revocable Trust was expressly provided for in Hanes, Sr.'s will and gave Hanes no greater rights than he already had with regard to his parents' assets. We conclude that Hanes did not commit fraud or defalcation while acting in a fiduciary capacity and his conduct did not cause the losses suffered by the Estate.

#### 3. Section 523(a)(4): Embezzlement.

■ The Estate also claimed that Hanes' conduct amounted to embezzlement. Under § 523(a)(4), federal law is controlling as to the definition of embezzlement. *O'Connor v. Booker (In re Booker)*, 165 B.R. 164, 171 (Bankr.M.D.N.C.1994). Embezzlement has been defined in this district as "the fraudulent misappropriation of property by a person to whom such property has been entrusted, or whose hands it has lawfully

come." *Maneval v. Davis (In re Davis)*, 155 B.R. 123, 130 (Bankr.E.D.Va.1993); *Hall v. Blanton (In re Blanton)*, 149 B.R. 393, 394 (Bankr.E.D.Va.1992). The elements for embezzlement are (1) debtor's appropriation of property for debtor's benefit, and (2) appropriation with fraudulent intent or by deceit. *See Clark v. Taylor (In re Taylor)*, 58 B.R. 849, 855 (Bankr.E.D.Va., 1986) (Bostetter, J.).

■ Turning to the second criteria, again we note that our discussion of § 523(a)(2)(A) concludes that the Estate failed to prove that Hanes acted with fraudulent intent. Recognizing that the Estate need not prove that the debtor acted out of spite, ill will or hatred, we still conclude that the Estate failed to prove that Hanes acted with the intent to wrongfully deprive the Estate of its property. *See Taylor*, 58 B.R. at 855. Hanes was entrusted with his parents' estates as Executor, Trustee and attorney-in-fact. He and his brother used the funds entrusted to them to make gifts to the beneficiaries and to devise an estate plan to avoid substantial estate taxes. Hope and the Hanes sisters supported the plan during its implementation. As a result, we find that Hanes reasonably believed that he had a right to use the funds entrusted to him and did not act with an intent to deceive his family.

Furthermore, the Estate failed to prove that Hanes used the funds entrusted to him for a purpose other than that authorized by the Trust. As discussed above, Hanes, Sr.'s will granted his sons absolute discretion in administering and managing his estate. The powers granted authorized Hanes to borrow money, pledge assets and make investments. When it became clear that his investment in DCI could not be saved, Hanes dismantled the family investment plan. The purchase of the loans backed by Hope's assets were not for Hanes' personal benefit, but were to avoid significant tax ramifications to the Estate. These actions came within the powers granted to Hanes and cannot support a claim of embezzlement.

We conclude that Hanes did not commit fraud or defalcation while acting in a fiduciary capacity nor did he embezzle funds entrusted to him. Accordingly, the Estate's claims under § 523(a)(4) are denied.

### F. Section 523(a)(6): Willful and Malicious Conduct.

■ The Estate's final claim against Hanes is that the debt incurred is nondischargeable under § 523(a)(6). Section 523(a)(6) excepts from discharge a debt that arose because of the debtor's willful and malicious injury to an entity or to the property of an entity. 11 U.S.C. § 523(a)(6). The use of the term entity rather than person broadens the scope of the exception. *See* 11 U.S.C. § 101(14) (definition of entity). Here, the alleged injury was to the Estate which falls within the purview of an entity.

■ To be excepted from discharge under § 523(a)(6), the Estate has the burden of proving that its injury was the result of Hanes' willful and malicious action. The Fourth Circuit has considered the level of proof required to establish a willful and malicious injury within the meaning of § 523(a)(6). Willful means "deliberate or intentional." *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1009–10 (4th Cir. 1985). As for malice, the Fourth Circuit has held that § 523(a)(6) does not require a plaintiff to prove specific malice, ill will or spite on the part of the debtor. *Id.* at 1010. Instead, implied malice may be shown by the acts or conduct of the debtor in the context of his surrounding circumstances. Id. "Under this standard for malice an act that is done deliberately and intentionally in knowing disregard of the rights of another would satisfy this implied malice standard." *Rountrey v. Lee (In re Lee)*, 90 B.R. 202, 207 (Bankr.E.D.Va.1988).

In the present case, Hanes' actions were certainly deliberate and intentional. Hanes devised the family investment plan and implemented it. He also intentionally dismantled the investment plan. However, we cannot find that he did so "in knowing disregard" of Hope's rights or the rights of the beneficiaries. As we concluded above, Hanes' actions were authorized by his father's will and Hope's power of attorney, consented to by Hope and by the Hanes

sisters and taken in good faith. As a result, Hanes could not convert funds which he reasonable believed he was authorized to use. We conclude that Hanes' conduct does not amount to malice. Therefore, the Estate's claim under § 523(a)(6) is denied.

### G. *Legal Malpractice Action against Reid & Priest and Joseph C. Mitchell.*

Plaintiffs contend that defendants Mitchell and Reid & Priest are liable to them for $9.2 million in connection with the failed investments made by HILP. Plaintiffs maintain that Mitchell and Reid & Priest committed attorney malpractice, fraud and conspiracy to defraud by reasons of their failure to disclose to Hope and the beneficiaries Hanes' alleged unauthorized actions and the instability of the investments made by John and David Hanes. Plaintiffs allege that the actions of defendants Mitchell and Reid & Priest amounted to aiding and abetting Hanes in wrongfully taking the money and property of his parents, the Marital Trust and the Revocable Trust for use by the DCI Companies and other business ventures.

■■■ Under New York Law, the elements of a cause of action for legal malpractice are: (1) the existence of an attorney–client relationship; (2) negligence on the part of the attorney or some other conduct in breach of that relationship; (3) proximate causation; and (4) proof that but for the attorney's negligence or conduct the client would not have sustained damages. *Sacco v. Burke*, 764 F.Supp. 918, 920 (S.D.N.Y.1991); *Condren v. Grace*, 783 F.Supp. 178, 187 (S.D.N.Y. 1992).

### 1. *No Attorney/Client Relationship Existed Between the Plaintiffs and Mitchell or Reid & Priest.*

Mitchell began billing work to the Estate of John W. Hanes, Sr. on December 16, 1987. After John W. Hanes, Sr.'s death, Mitchell did extensive legal work for the Estate as well as the Marital Trust established under his will. From December 16, 1987 until October 5, 1993, Reid & Priest billed and incurred time with a value in excess of $284,-000 representing the Estate of John W.

Hanes, Sr., the Marital Trust, the Hope Y. Hanes Revocable Trust, Hope Y. Hanes individually, and the Estate of Hope Y. Hanes with regard to gift, estate and income taxes. In his representation of the Marital Trust, Mitchell represented John and David Hanes as Trustees of the Marital Trust.

■■■ The New York rule regarding actions involving legal malpractice is that absent fraud, collusion, malicious acts or special circumstances, an attorney is not liable to third parties not in privity for harm caused by professional negligence. *See, e.g., Viscardi v. Lerner*, 125 A.D.2d 662, 510 N.Y.S.2d 183 (1986); *Spivey v. Pulley*, 138 A.D.2d 563, 526 N.Y.S.2d 145, 146 (1988). Under the privity rule, New York courts consistently hold that the beneficiaries of a trust cannot bring an action for legal malpractice against the attorneys for the trustee of the trust. *See, e.g., Weingarten v. Warren*, 753 F.Supp. 491, 496–97 (S.D.N.Y.1990) (court dismissed claim for malpractice brought by a trust beneficiary against counsel for the trustee on the basis of no privity); *Matter of Newhoff*, 107 Misc.2d 589, 435 N.Y.S.2d 632 (Sur.Ct.1980), *aff'd*, 107 A.D.2d 417, 486 N.Y.S.2d 956 (1985); *Felson v. Miller*, 674 F.Supp. 975, 978–79 (E.D.N.Y.1987) (absent privity of contract or "special circumstances," trust beneficiary could not sue attorney for legal malpractice); *Kramer v. Belfi*, 106 A.D.2d 615, 482 N.Y.S.2d 898, 900 (1984) (Dismissing claims for legal malpractice brought by estate's beneficiaries against attorneys retained to represent executor only); *see also N.Y St. Bar Ass'n Comm'n on Professional Ethics Op.* 649 at 2 n. 2 (1993) ("[A]bsent specific circumstances to the contrary, beneficiaries have no attorney–client relationship with the executor's lawyer."); *accord* Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 31.4 (4th ed. 1996) ("An attorney for a trustee owes no legal duty to the beneficiaries of a trust.").

■■■ Like the attorney defendants in *Weingarten, Newhoff* and *Felson*, there is no privity between the trust remaindermen and the attorney defendants. The attorney–client relationship existed between Mitchell and John and David Hanes as Executors and

Trustees of Hanes, Sr.'s Estate and the Marital Trust. Additionally, an attorney–client relationship existed between Mitchell and Mrs. Hanes. Although this action is brought in the name of the Estate of Hope Y. Hanes and the Revocable Trust, the only interests at stake here are those of the beneficiaries. Further, there is no evidence that special circumstances existed amounting to an attorney–client relationship. Therefore, the plaintiffs' cause of action for malpractice against Mitchell and Reid & Priest must be dismissed on the basis of lack of privity.[33]

### 2. Defendants Mitchell and Reid & Priest Did Not Breach Their Duty of Undivided Loyalty to Hope or the Beneficiaries.

■ Plaintiffs contend that under New York law, Mitchell and Reid & Priest had a duty of undivided loyalty to Hope and the beneficiaries of the Marital Trust. *See Weingarten*, 753 F.Supp. 491; *Gibbs v. Breed, Abbott & Morgan*, 170 Misc.2d 493, 649 N.Y.S.2d 974, 977 (N.Y.1996) (citing *In re Bond & Mortgage Guarantee Co.*, 303 N.Y. 423, 103 N.E.2d 721 (1952); *Matter of Clarke's Estate*, 12 N.Y.2d 183, 237 N.Y.S.2d 694, 188 N.E.2d 128 (1962).) In *Bond & Mortgage, Clarke's* and *Weingarten*, the highest court of New York allowed a beneficiary to maintain a cause of action against an attorney for a fiduciary, not for legal malpractice, but for breach of the duty of loyalty. *Clarke's Estate* involved an action by beneficiaries in an accounting proceeding against the executors and their attorney where the attorney entered into an agreement with a real estate broker for the attorney to receive part of the broker's commission on the sale of estate property. In *Clarke's Estate*, the New York Court of Appeals stated in dictum: "An attorney for the fiduciary has the same duty of undivided loyalty to the cestui as the fiduciary himself." 237 N.Y.S.2d at 697, 188

N.E.2d at 130. The court held that the attorney put himself in a position of divided loyalty by his conduct and denied the attorney all compensation sought in the proceeding. *Id.*

In *Bond & Mortgage Guarantee Co.*, 103 N.E.2d 721, the attorneys for a trustee who held certificates of participation in a mortgage for the benefit of the certificate holders (the beneficiaries) purchased such certificates from an independent broker at an advantageous price and the attorneys never informed the beneficiaries that they were buying the certificates, the attorneys were found to hold the certificates in a constructive trust for the beneficiaries. In that case, New York's highest court stated: "The attorneys, concededly in the same position as the trustee, owed an equally high degree of fidelity by reason of their status as attorneys for the trustee, they were no less fiduciaries than was the trustee himself." *Id.* at 725.

In *Weingarten*, 753 F.Supp. 491, the trust remaindermen sued the attorney for the deceased trustee–income beneficiary for breach of a fiduciary duty they claimed the attorney owed to them and for malpractice, alleging that he breached the duty of competence and honesty he owed to all beneficiaries as counsel to the trustee. The attorney had acted as counsel to the trustee–income beneficiary (who was the remaindermen's grandmother) from 1961 until 1989, when she died. Applying New York law, the *Weingarten* court dismissed the plaintiffs' cause of action for malpractice based on lack of privity. However, the court held that the remaindermen had stated a cause of action against the attorney for breach of fiduciary duty. The court, quoting from *Clarke's Estate, supra,* and *Bond & Mortgage, supra,* stated: "'An attorney for a fiduciary has the same duty of undivided loyalty to the cestui as the fiduciary himself'... '[B]y reason of their status as

---

**33.** The complaint here cannot be viewed more favorably because it was commenced by Ms. Caldwell as Executrix of Mrs. Hanes Estate instead of individually as an intended beneficiary who suffered a loss as a result of defendants' alleged negligence. *Deeb v. Johnson*, 145 Misc.2d 942, 548 N.Y.S.2d 622, aff'd, 170 A.D.2d 865, 566 N.Y.S.2d 688; *Spivey v. Pulley*, 138 A.D.2d at 563, 526 N.Y.S.2d 145. "The privity

requirement would be rendered meaningless if it could be circumvented by the simple device of having a fiduciary appointed for the estate of the deceased client who would then commence the proceeding against the attorney on behalf of all, or some, of the beneficiaries of the estate." *In the Matter of the Estate Pascale*, 168 Misc.2d 891, 644 N.Y.S.2d 887 (Sur.Ct.1996).

attorneys for the trustee, [they] were no less fiduciaries than was the trustee himself.'" *Weingarten,* 753 F.Supp. at 496. The court further stated: "By alleging that [the attorney] acted as attorney for the trustee and that he violated his fiduciary duty to the beneficiaries, plaintiffs have stated a cause of action against [the attorney] individually for breach of fiduciary duty." *Id.* Thus, while *Clarke's Estate* and *Bond & Mortgage* involved situations in which the fiduciary's attorney personally benefitted by some wrongdoing, the court in *Weingarten* imposed a duty upon the fiduciary's attorney to the beneficiaries even in the absence of such wrongdoing.

■ In the case at bar, based on the record and evidence adduced at trial, we cannot find that Mitchell or Reid & Priest breached the duty of loyalty to Hope or the beneficiaries. At the outset, we note that the plaintiff's theory of breach must fail based upon our conclusions above that Hanes acted within the authority granted to him. It is undisputed that Mr. and Mrs. Hanes executed powers of attorney appointing their sons, John and David, to act as their attorneys-in-fact. "Under New York law, '[p]ursuant to a power of attorney, the attorney-in-fact is empowered to take any and all acts as fully as the principal might or could do.'" *Heine v. Newman Tannenbaum,* 856 F.Supp. 190, 194 (S.D.N.Y.1994), *aff'd,* 50 F.3d 2 (2d Cir. 1995) (quoting *Zaubler v. Picone,* 100 A.D.2d 620, 473 N.Y.S.2d 580, 582 (1984)). The powers of attorney in this case are no exception. The powers of attorney granted John and David plenary authority with respect to the administration of their parents' property. These instruments gave them authority to:

> make, sign, seal, endorse, accept, execute, acknowledge and deliver any and all contracts, agreements, specialties, acquittances, assignments, leases, transfers, deeds, instruments of conveyance, mortgages, bonds, notes, checks, drafts, bills of exchange, orders for the payment of money and other instruments and obligations of every kind, whether of a similar or a different nature; and generally to do all things which in the judgment of said Attorneys are necessary or advisable to be done for me or on my behalf, either within the State of New York or elsewhere in the world, in connection with my affairs and business or in connection with my property as hereinafter defined; and in particular, without in any way limiting the broad and general powers which it is my intention to confer upon said Attorneys, on my behalf and for my account, and either in my name or otherwise.
>
> I hereby give and grant to said Attorneys full power and authority to do and perform every act or thing which said Attorneys shall deem necessary or advisable in and about the premises as fully to all intents and purposes as I could do if I were personally present and acting and I hereby ratify and confirm all that said Attorney or any substitute or substitutes appointed as above provided shall lawfully do or cause to be done by virtue hereof. . . .

This language literally gave the brothers all of the powers which Hanes, Sr. and Hope had with regard to her own assets. No restrictions are placed upon the attorneys-in-fact or on parties dealing with them in that capacity. In fact, in a letter dated June 2, 1987, Hope reconfirmed her intention not to limit her sons authority, stating:

> since a question has been raised, I also wish to state that it was my intention, when I gave David and John my full power of attorney dated June 4, 1985, that they should utilize these powers, among other things, to make or dispose of investments, make gifts, engage in various transactions for investments and/or tax planning purposes and generally act in my stead in any way and all such ways as they, in their complete discretion, feel proper.

In most instances, Mitchell dealt directly with John and David with regard to Hope's estate. Additionally, Mitchell met with Hope on occasion to discuss matters involving her estate. During these meetings, Hope executed the documentation necessary to effectuate various transactions. There is no evidence that Hope was concerned or questioned any of these transactions. In fact, the documents she signed contain explicit references to the amounts borrowed and the use of her assets and the Marital Trust's assets as collateral

for loans. Mitchell had no reason to doubt that she understood both the substance and the purpose of the transactions. Furthermore, John and David represented to Mitchell that Hope and the family were being kept informed on a consistent and ongoing basis. Mitchell received copies of several of the memoranda sent to the family and attended family meetings on occasion. It was completely reasonable for him to rely on these representations.

The evidence leaves no question that Hope gave John and David full authority to act on her behalf and was aware of her sons' activities. Mitchell was entitled to rely upon John and David's representations that Hope and the Hanes sisters were being kept informed. In addition, we find that Mitchell's dealings with Hope provided an independent basis for him to conclude that Hope was well aware of the transactions involved in the family investment plan and acquiesced in her sons' activities. Moreover, we find that Mitchell had no duty to verify with Hope the representations made by her attorneys–in–fact. *See Heine*, 856 F.Supp. at 195 (stating "[i]f the parties were required to verify with the principal each instruction given to them by the attorney–in–fact, the authority given to the attorney–in–fact would be eviscerated"). Thus, we conclude that Mitchell and Reid & Priest were justified in relying on the powers of attorney when working with John and David. *See Crandall v. Personal Mortg. Corp.*, 210 A.D.2d 981, 621 N.Y.S.2d 249, 250 (1994) ("In the absence of proof of revocation, the duly executed general power ... authorized defendants to rely upon the power of attorney.").

 To the extent that the remaining allegations against Mitchell and Reid & Priest are identical to those against Hanes, we refer to our conclusions above that Hanes did not commit fraud or breach his duties to Hope or the beneficiaries. Thus, Mitchell and Reid & Priest cannot be held to have aided and abetted Hanes in the commission of a fraud. *See Brackett v. Griswold*, 112 N.Y. 454, 20 N.E. 376, 379 (1889); *see also National Westminster Bank v. Weksel*, 124 A.D.2d 144, 511 N.Y.S.2d 626, 630 (1987).

Significantly, the plaintiffs did not assert that Mitchell committed the kind of breach of undivided loyalty as that found in *Clarke's Estate and Bond & Mortgage*. Moreover, we cannot discern any evidence in the record amounting to the kind of misconduct found to constitute a breach in those cases. Mitchell and Reid & Priest did not act to prefer their own interests over that of Hope or the beneficiaries. Therefore, we conclude that Mitchell and Reid & Priest did not commit professional malpractice or breach their duty of loyalty to Hope or the beneficiaries.

### CONCLUSION.

For the foregoing reasons, we hereby enter judgment in favor of the Debtor/Defendant, John W. Hanes, Jr,. on Counts II, III, IV, and V of the Third Amended Complaint on the issues of liability for damages and determination of dischargeability. In addition, Hanes' objection to the Estate's Proof of Claim No. 23 is sustained.

Further, we hereby entered judgment in favor of Defendants Joseph Mitchell, Esq. and the Reid & Priest LLP on Count VI of the Third Amended Complaint. Therefore, the Complaint filed by Susan H. Caldwell, Executrix of the Estate of Hope Y. Hanes and Turney McKnight, Trustees of the Revocable Trust of Hope Y. Hanes against John W. Hanes, Jr. and Joseph Mitchell, Esq. and Reid & Priest is dismissed.

The Court will enter an Order pursuant to our ruling.